Argued and submitted May 7, Court of Appeals reversed and circuit court judgment of convict on reinstated August 26, 1986

STATE OF OREGON,
*Petitioner on review,*

*v.*

PHILIP KENNETH JOHNS,
*Respondent on review.*

(CC 83-1074; CA A31705; SC S32445)

725 P2d 312

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Philip Kenneth Johns, argued the cause *pro se* as respondent on review.

JONES, J.

## JONES, J.

Defendant was convicted of murdering his wife, who was shot in the head with a revolver. He appealed to the Court of Appeals, asserting trial court error in admitting testimony concerning two prior incidents, one a crime and the other a noncriminal act. The Court of Appeals held that the evidence of prior acts was inadmissible and prejudicial, and reversed and remanded the case for a new trial. The state petitions this court for review. We reverse the Court of Appeals.

### FACTS

At 9:06 a.m. on November 20, 1983, defendant telephoned the police to report that his wife had been shot accidentally while in the bedroom of their home. The police soon arrived and discovered the victim on the bed, lying on her back with her head on a pillow. A .38 caliber revolver and four cartridges were on the bed near the victim's knees. She was taken to the hospital, where she died the next day. An autopsy determined she died from a gunshot wound to the back of the head. The bullet traveled almost straight from the back to the front of her head, lodging above the left eye. The state's evidence was that the muzzle of the gun was about six inches to two and one-half feet from the victim's head.

Police officers described defendant as upset, in shock, nervous and talkative when they arrived. One officer observed a small drop of blood on his finger and a gray, sparkly substance on his hand. Another officer observed "flat black stains" on defendant's hands and "some dark gray fine crystalline powder residue on the right index finger area and the area up to the webbing of the thumb."

Defendant told the officer that the black stains came from polishing shoes; a pair of black shoes wet with polish was nearby. The officers believed that the gray powder was gunpowder residue. However, defendant washed his hands in the restroom at the police station despite an officer's direction to the contrary. The police found no trace of gunpowder residue on either the defendant's or the victim's hands in subsequent testing.

Defendant described the shooting as accidental. Defendant did not testify, but his version was presented to the jury through his tape-recorded statement to the police, his

video-taped re-enactments of his story and an officer's testimony relating statements defendant made soon after the police arrived at the scene. According to defendant, he returned home from his graveyard shift as a security guard shortly after 8 a.m. and entered the dark bedroom. As he walked toward the bed there was a bright flash and a loud bang, which he realized was a gunshot. He shouted, "Shit, don't, it's me," and lunged for the gun. He tried to take the gun out of his wife's hand and, as he landed on the bed,

> "* * * her arm just seemed to flop up against the pillow and there was a hell of a bang and she just started to moan and the first finger nearest my thumb on my right hand started to vibrate and she started to quiver and shake and I just grabbed the gun and uh opened the cylinder and just threw it down on the bed and raced around the end of the bed, grabbed the telephone and rang 911. * * *"

Defendant said that his hand was on the weapon when it discharged. The police found a bullet in the wall that had passed through a closet door and appeared to have been fired from the bed.

Defendant's version of what happened was presented to the jury without defendant ever taking an oath, the jury ever observing his testimonial demeanor and defendant ever being cross-examined. We will not comment on how much of this self-serving hearsay evidence was admissible. However, it did reveal that according to defendant his wife shot at him as he entered their bedroom and that while he was trying to wrest the weapon from her hand, the gun discharged the fatal shot to the back of her head.

The Court of Appeals detailed the prosecution's case as follows:

> "The prosecution presented evidence concerning defendant's motive to kill his wife and attempted to discredit his explanation of the alleged accident both by arguing that his version was physically implausible and by introducing evidence of prior bad acts to establish intent in this case. Evidence admitted without objection establishes the following. Several witnesses testified that the victim had told them that she was unhappy in her marriage, wanted defendant to move out and desired to terminate the marriage. The victim told one witness that defendant had threatened her with guns about nine months before she died and that she was afraid of

defendant. The state introduced letters written by the victim to her paramour within six months of her death, in which she wrote of her dissatisfaction with her marriage and her frustration due to her inability to get defendant to move out. She wrote that she wanted to end the marriage but was 'scared' to do it and afraid to file for divorce, because she feared that defendant would try to take her property. She wrote that defendant had threatened her, that she was living in fear for her safety and was afraid that defendant would try to hurt or kill her. She also wrote that defendant was the only person toward whom she had 'violent thoughts' and whom she had 'ever thought of hurting.' The prosecution also presented evidence that the victim was afraid of guns and did not like. having them in the house.

"One witness for the prosecution testified that defendant had stated three months before the victim's death, 'My wife's a liability and not an asset and I got to figure out how to get rid of her.' Another witness testified that defendant had told her that 'if he ever found his wife with another man he would kill her,' that he subsequently had said he was positive his wife had a lover but he did not carry out his threat. Another witness testified that defendant had told him he was going to New Zealand around Christmas and would have between $80,000 and $100,000 when he returned, which he would like to invest. There were two policies insuring the victim's life for a total of $80,000 and naming defendant as beneficiary, for which application was made on June 13, 1983. Applications for comparable policies insuring defendant's life and naming the victim as beneficiary were made on the same date."

The letters referred to by the Court of Appeals also revealed that the marriage was plagued by defendant's financial dependence upon his wife and his irregular employment. Other evidence revealed that in Oregon, as in New Zealand, defendant failed to become a regular police officer, but had been a member of the Portland police reserve.

In the Court of Appeals, defendant assigned error to the trial court's denial of his motions to limit the introduction of evidence of two prior acts. The first prior act was defendant's assault on his former wife, Barbara Johns, not the victim in this case, which took place in New Zealand almost six years before the death in this case. Barbara Johns was allowed to testify to the details of that assault, as well as to describe their marital problems. In addition, a police officer from New Zealand, an acquaintance of defendant's, testified

about that incident. The state transported both witnesses from New Zealand to testify.

The New Zealand incident occurred on December 25, 1977. Defendant and Barbara Johns had then been legally separated for about five months. She testified that their finances were never good and that defendant resented her role as the primary provider. Both applied to become traffic officers in May 1977, and Barbara was accepted; defendant was rejected. She felt that he was "very bitter" about the rejection. She testified that he made several threatening telephone calls to her during their separation, including that "if he couldn't have me no one else could" and "if we couldn't be together in life he wanted us to be together in death." She then testified about the December 25 assault:

> "* * * About 8:45 on Christmas morning, Philip [defendant] came to my flat. He walked in and stood with his back to the door, which he closed. In his hands he had a .22 rifle fitted with a silencer. I could see that the weapon was loaded, it had a full clip on the rifle and the bolt at that stage was open. He didn't say anything. He just stood with his back to the door shaking his head and biting his lip. And I shouted, 'No.' And he cocked the rifle, he pushed the bolt home. I felt that the only way I could get out was to try and either get the gun off him or get through the door which he was blocking. And I grabbed the rifle and tried to wrestle it off him. I started screaming in hopes that somebody would hear me and he yelled at me to shut up. He started hitting me around the head with the rifle. And as a result of that I received later on a stitch to a cut on the back of my head, several other bruises and cuts on the top of my head, which were bleeding quite badly and bruises to the left hand.
>
> "At one stage I noted that the gun was pointing down towards the floor, at a speaker of my stereo, and I tried to pull the trigger. I thought if I could get the bullets out of the chamber that it would give me time to run away, because by that stage we were slightly away from the door. I pulled the trigger and nothing happened. And Philip yelled, 'Of course the safety catch is on.' So I pushed him and the rifle away and took off and ran to a neighbor's place for help. As I ran out the door I heard him yell, 'All right, you can shoot me then.' "

She testified that she "was convinced that he had come to kill me."

The trial court also admitted a letter that defendant

sent to Barbara Johns in which he apologized and tried to explain his actions. Defendant was convicted of "common assault" for the incident, the equivalent of a misdemeanor, and placed on probation.

Pickles, a police officer in New Zealand at the time of the incident, testified that he met with defendant later that day. Defendant had phoned the police department after leaving Barbara's flat, threatened to kill himself and asked to speak with Pickles, who testified as follows:

"* * * He was, as I say, had had a domestic problem with his wife. He was very upset at the time, looked very emotionally fragile inasmuch as I felt he had been crying and perhaps could well have been close to tears again. We spoke for some time and he was very concerned about his wife and the marital situation. He was a person that was having emotional problems.

"* * * * *

"Initially we wanted to know the incident regarding the defendant's wife, and he explained that he had been to his wife's house that morning, Christmas morning, and that he had gone there to discuss the marital problems — well, the problems they were having. He went there with his rifle. He said it was loaded and cocked. And that he gained entry just by walking into the house, the same as his wife would open the door. There was some discussion about the need for the firearm to be there and he told her that there was — that he was in a depressed state; that he was very low. And he told the Sergeant that he leveled the firearm, the rifle at her and that she grabbed it and there was a struggle. He didn't actually admit hurting her with the firearm, but he did say that he thought she had been hit several times on the head. He did say that when he pointed the gun at her initially he wanted to shoot her and himself, um, to end their love. He then made a comment that luckily during the struggle the safety catch was on and the gun did not go off. She then broke free from the fight and fled the house. And he left the house as well.

"He said that after that incident all he then wanted to do was end his own life. And that's the situation — that's how I got involved because he rang the police to say that he was going to shoot himself."

The Court of Appeals held that the evidence concerning the 1977 incident was improperly admitted under OEC

404(3) to prove defendant's intent and the absence of mistake or accident in the shooting of his second wife.

## THE "OTHER CRIMES, WRONGS OR ACTS" RULE

Oregon Rule of Evidence 404(3), which is identical to Federal Rule of Evidence 404(b), reads:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The legislature added the following unofficial commentary to aid courts in interpreting OEC 404(3):

> "Subsection (3) deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistent with that rule, evidence of other crimes, wrongs or acts is not admissible to prove character for the purpose of suggesting that conduct on a particular occasion was in conformity therewith. However, such evidence may be offered for purposes that do not fall within the prohibition. See *State v. Brown,* 231 Or 297, 372 P2d 779 (1962) (evidence of stealing cars admitted to show intent to avoid punishment for present crime); *State v. Long,* 195 Or 81, 244 P2d 1033 (1952) (evidence of murder of truck owner admitted to establish motive; defendant shortly afterward used truck to commit a robbery). This rule holds true in both civil and criminal cases. *Karsun v. Kelley,* 258 Or 155, 482 P2d 533 (1971). The list of purposes set forth in subsection (3) for which evidence of other crimes, wrongs or acts may be admitted is not meant to be exclusive.

> "When evidence of other crimes, wrongs or acts is sought to be admitted under subsection (3), the court is not required to admit the evidence. The court must determine whether the danger of undue prejudice outweighs the probative value of the evidence, taking into account the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403. Slough and Knightly, 'Other Vices, Other Crimes,' in 41 Iowa L Rev 325 (1956). No mechanical solution to the problem is offered or is desirable." Commentary to Oregon Evidence Code 70 (Butterworth 1981).

The commentary introduces the balancing test contained in OEC 403, *post* at 550, requiring trial judges to weigh the danger of undue prejudice against the probative value of the evidence for solving problems arising under OEC 404(3). OEC 404(3) does not use the word "discretion," but says that other crime evidence "may" be admissible for certain purposes, thus setting a permissive rather than a mandatory rule for admission of evidence.

OEC 404(3) and FRE 404(b) codify a common law rule that has created one of the most frequently litigated evidentiary issues in appellate courts. A massive body of caselaw involves other offenses as evidence of the offense charged. A WESTLAW search of key numbers 369 ("Other offenses as evidence of offense charged in general"), 370 ("Acts showing knowledge"), and 371 ("Acts showing intent or malice or motive") revealed 11,607 state cases, including 153 Oregon appellate decisions, and 1,894 federal cases.

Professor Edward Imwinkelried has written an entire treatise explaining the 53 words contained in the two sentences of FRE 404(b) and its state counterparts. Imwinkelried contends:

"* * * This type of evidence is so popular with prosecutors that it has been called 'the Prosecutor's Delight.' Dean McCormick declared that the cases dealing with this problem are as numerous 'as. the sands of the seas.' Federal Rule of Evidence 404(b) has generated more reported decisions than any other Rule. In many jurisdictions, the admissibility of uncharged misconduct is the most frequently litigated issue on appeal; and the erroneous admission of such evidence is the largest cause of reversal. This trend is likely to continue, since a growing number of jurisdictions are organizing career criminal units and assembling more complete information about defendants' past misdeeds.

"The topic has also generated extensive scholarly commentary. The number of law review articles on uncharged misconduct is staggering. There is an article dealing with the law of uncharged misconduct in almost every state and several federal circuits.[1] * * * Uncharged misconduct is probably second only to the hearsay doctrine in terms of the volume of

---

[1] See Appendix of list of law review articles from Imwinkelried, Uncharged Misconduct Evidence 9-11 nn 9-11, § 1:04 (1984).

academic commentary." Imwinkelried, Uncharged Misconduct Evidence 8, § 1:04 (1984) (footnotes omitted).

Before codification, Dean John Henry Wigmore described the common-law rule:

> "The doing of another criminal act, not a part of the issue, is * * * not admissible as evidence of the doing of the criminal act charged, except when offered for the specific purpose of evidencing Design, Plan, Motive, Identity, Intent or other relevant fact * * * distinct from Moral Character." Wigmore, Code of Evidence 81 (3d ed 1942).

In contrast to Wigmore's formulation, Rule 311 of the ALI Model Code of Evidence (1942) described the rule in reverse form,

> "Subject to Rule 306, evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible as tending to prove that he committed a crime or civil wrong on another occasion if, but only if, the evidence is relevant solely as tending to prove his disposition to commit such a crime or civil wrong or to commit crimes or civil wrongs generally."

The Model Code was a rule of inclusion.

OEC 404(3) clearly expresses the inclusionary rule. Many courts purport to adhere to a different approach, the so-called exclusionary view. Under this view evidence of defendant's prior crimes, acts or wrongs is admissible only to prove the defendant's lack of mistake or accident, identity, motive, intent, or plan; the "prior crime" evidence is inadmissible for any purpose not enumerated in the specific category.

A vast amount of literature discusses the inclusionary versus exclusionary views and a substantial split of authority by the courts in applying one view or the other. Fortunately, the legislative comment to OEC 404(3) makes clear that Oregon has adopted the inclusionary approach. The comment unequivocally states, "The list of purposes set forth in subsection (3) for which evidence of other crimes, wrongs or acts may be admitted is not meant to be exclusive." Commentary, *supra* at 70. These simple words in the commentary resolve a legal dispute that dates back more than three centuries. The original attitude of the English courts was that any relevant evidence of the defendant's misconduct was admissible even if the only theory of relevance was to establish the defendant's character and in turn use character as circumstantial proof of

conduct. Imwinkelried, *supra* at 58-59, § 2.24. A passage from Foster, Crown Law 246 (1st ed 1762), demonstrates that the rule prohibiting evidence of other crimes, wrongs or acts was based on relevancy — that is, Foster's rule prohibited only evidence of other crimes

"* * * that is *foreign to the point in issue* [*the rule*], is founded on sound sense and common justice. For no man is bound at the peril of life or liberty, fortune or reputation, to answer at once and unprepared for every action of his life. * * * And had not those concerned in state prosecutions out of their zeal for the publick service, sometimes stepped over this rule in the case of treasons, it would perhaps have been needless to have made an express provision against it in that case. Since the common-law grounded on the principles of natural justice hath made the like provision in every other." (Emphasis added.)

In Chapter 2 of his treatise, Professor Imwinkelried relates the history of the "prior crime" evidentiary rule. He reports that in *Rex v. Cole* (cited in Stone, *The Rule of Exclusion of Similar Fact Evidence: America,* 51 Harv L Rev 988, 992 (1938)), the English court announced that the character theory of logical relevance is ordinarily forbidden to the prosecution and apparently established the rule in England that excludes other bad acts evidence that merely demonstrates a defendant's propensity to do acts similar to those charged. Imwinkelried, *supra* at 59, § 2:24. However, the English courts soon began admitting evidence of misconduct to prove defendant's guilty knowledge, although some commentators and counsel began referring to the alternative theories as exceptions. Lord Herschell dispelled any such limitation in his opinion in *Makin v. Attorney General of New South Wales,* AC 57 (1893).

In *Makin,* a husband and wife were convicted of murdering an infant left in their care. The baby's body was found buried in the garden of their house. The prosecution offered uncharged misconduct evidence that over the years bodies of ten other babies were found buried in the gardens of three other houses that the couple had occupied. Although there was no evidence of the cause of death in the charged offense, the evidence of the other similar acts was admitted. The *Makin* decision clarified the law in England and declared that the inclusionary approach was the sound approach.

Evidence of the defendant's uncharged misconduct was inadmissible only when the proponent's sole theory of logical relevance was the use of the defendant's character as circumstantial proof of conduct. *Makin* made it clear that the inclusionary approach was the proper approach to apply in that country. *See* Imwinkelried, *supra* at 61, § 2.25; *cf.* Krivosha, Lansworth & Pirsch, *Relevancy: The Necessary Element in Using Evidence of Other Crimes, Wrongs, or Bad Acts to Convict,* 60 Neb L Rev 657, 666 (1981).

In *The Rule of Exclusion of Similar Fact Evidence: America, supra,* 51 Harv L Rev at 1000, Professor Julius Stone concluded that before 1840 all American decisions concerning the admission of uncharged misconduct applied the inclusionary view, but that by the mid-nineteenth century the American courts began to lose sight of the original rule and 1pplied a general exclusionary rule confining "other crime, act or wrong evidence" to a limited number of exceptions.

In 1901, the New York Court of Appeals case of *People v. Molineux,* 168 NY 264, 61 NE 286 (1901), gave great momentum to the exclusionary approach in the United States. Molineux was indicted for poisoning Mrs. Adams. The poison, mingled with Bromo Seltzer, had been sent to a Harry Cornish through the mail. Cornish innocently administered the poison to Mrs. Adams. Evidence of a similar poisoning was admitted in the trial. The appellate court unanimously held that the uncharged conduct was erroneously admitted.

Professor Stone comments that the *Molineux* opinion triggered a duel between the inclusionary and exclusionary approaches in the United States. 51 Harv L Rev at 1023. Professor Stone criticized the exclusionary approach, contending that courts following it often imprecisely analyzed the logical relevance issue and sometimes treated the list of five or so exceptions as if the list stated a single principle, rather than identifying the specific fact that the uncharged conduct was being offered to prove. Stone also contended that the exclusionary view might exclude evidence logically relevant on a theory other than character. *Id.* at 1011. If the fact the misconduct was offered to prove did not fall squarely within the recognized exception, the court's natural tendency was to exclude the evidence automatically. Further, the rigid application of the exclusionary rule could lead to the admissibility of

irrelevant evidence because courts applying it tended to inquire only whether the misconduct was relevant to one of the exceptions and might not bother to reach the more fundamental question whether the exception was truly an issue in the pending case. *Id.* at 1031.

Finally, Stone reflected that courts applying the exclusionary view sometimes lose sight of the policy justification for the prohibition of using the defendant's character as circumstantial proof of the defendant's conduct. *Id.* at 1033. The inclusionary approach forbids one, and only one, theory of logical relevance. By singling out that theory, the inclusionary approach highlights the forbidden theory. Highlighting the forbidden theory underscores the relevant policies—the danger of prejudice when the jury focuses on the defendant's character and the danger of the jury over-estimating the probative value of character as a predicter of behavior. The inclusionary view alerts the court to those policies. *See* Imwinkelried, *supra* at 68, § 2:29.

Professor Anthony Amsterdam argues that the inclusionary rule is the proper approach for courts.

> " 'It is often stated as a general rule of evidence that a defendant's prior record and evidence of unrelated crimes are inadmissible; then a number of "exceptions" to the rule—use of other offenses to show identity, motive, common scheme, etc.—are defined. This may be well and good, if the trial judge believes it; but there is no such general rule. Prior record and unrelated crimes are inadmissible, like other facts, unless they are relevant. If they are relevant, they are admissible, and the so-called exceptions simply state the several grounds of relevancy. The actual evidentiary principle involved here is that there is one specific purpose for which prior crime evidence may not be used—that is, for the purpose of showing that the defendant is an evil or a vicious man, as a basis for the further inference that he therefore is guilty of the present charge.' " Imwinkelried, *supra* at 69, § 2:29, quoting Amsterdam, Segal & Miller, Trial Manual for the Defense of Criminal Cases 1-369, § 368 (3d ed 1974).

Federal Rule of Evidence 404(b) has been described as legislative adoption of vintage inclusionary approach, leading some commentators to argue that the second sentence is surplusage and that the rule should simply read, "Evidence of other crimes, wrongs or acts is not admissible to prove the

character of a person in order to show that he acted in conformity therewith." The second sentence lists theories of relevant examples rather than exceptions.

■    The upshot of this discussion of the inclusionary versus the exclusionary rule is that courts in this state applying the inclusionary rule of OEC 404(3) have more latitude in admitting other crime evidence than states that apply the exclusionary rule. The inclusionary rule in this state allows Oregon judges to resort to any theory of logical relevance when ruling on "prior crime" evidence that does not run afoul of the "propensity to commit crimes or other acts" prohibition. The list of purposes are only examples of exceptions to the general prohibition. In sum, OEC 404(3) forbids "prior crime" evidence only when the evidence is offered solely to prove (1) the character of a person, and (2) that the person acted in conformity therewith. Both elements are required.

How do we define character? The Federal Rules of Evidence do not define it, nor does the Oregon Evidence Code. Wright and Graham, in their massive work on Federal Practice and Procedure comment that definitions of character that appear in prior caselaw are often erroneous and seldom helpful, Wright and Graham, 22 Federal Practice and Procedure 350, § 5233 (1978), and that Model Code Rule 304 contained the only codification of a definition of character. The Model Code defined "character" as "the aggregate of a person's traits, including those relating to care and skill and their opposites." So far as we can determine, this definition was never adopted by any state legislature or court and has little utility. Wigmore defined "character" as the "actual moral or psychical disposition of a person." 1 Wigmore, Evidence 448, § 52 (3d ed 1940). But what do these terms mean in late twentieth century usage? In these days of changing values, we doubt that we could effectively define "moral" or "psychical" disposition.

■    We conclude that when applied to OEC 404(3), "character" refers to disposition or propensity to commit certain crimes, wrongs or acts. Propensity to do an act must not be confused with habit, which is one's regular response to a repeated specific situation as described in OEC 406 ("Habit, routine practice"). OEC 404(3) unquestionably forbids the

admission of evidence solely to show propensity or that the defendant is a bad person.

Perhaps litigation over the admissibility of "other crimes, wrongs or acts" evidence could be reduced if litigators and judges would follow the preachings of Coach Vince Lombardi to his players "to return to the basics." Trial judges should return to the basic reasons for the inadmissibility of evidence of other crimes, wrongs or acts, which are: (1) such evidence often is irrelevant to prove the conduct in question; (2) the common law and its codification forbids the attempt to prove a defendant guilty by proving the defendant is a bad person or has bad character because of disposition or propensity for committing crimes, wrongs or other bad acts; and (3) even if evidence that a defendant has committed other crimes has some legitimate probative value, the danger of unfair prejudice to the defendant may outweigh any such probative value. *See State v. Manrique,* 271 Or 201, 206, 531 P2d 239 (1975). If the only theme is "once a burglar always a burglar," the evidence cannot be used as a ticket for admission. That concept does not qualify prior crime evidence for admission.

■ In examining any evidence to be admitted under OEC 404(3), the trial judge must not jump immediately into the listed categories or exceptions before determining the basic relevancy of the proffered evidence. Before evidence of another crime, wrong or act may be introduced, the trial judge must determine the act's relevancy to the issues being tried. The admissibility of evidence of other crimes must not be based upon the relationship of the evidence to one of the listed categories, rather it must be based on its relevancy to a fact at issue in the trial. The proper inquiry has been emphasized by the Chief Justice of Nebraska and his co-authors in a law review article:

> "Relevancy is the key to the entire analysis of the admissibility of evidence of other crimes, wrongs, or acts. Therefore, the proper inquiry is the probative relationship between the evidence and a fact at issue in the case before the court, not the relationship of the evidence to a categorical list of exceptions." Krivosha, Lansworth & Pirsch, *supra,* 60 Neb L Rev at 662.

Even if the evidence is relevant for some purpose other than proving a propensity to commit certain acts, the

trial judge's task is not completed. The judge still must decide whether to admit the evidence and must articulate reasons for that decision on the record. In other words, in deciding issues under OEC 404(3) the trial court must apply OEC 403, which reads:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Following the basic approach outlined in this opinion, we first must trace the line of relevancy to the ultimate issue in the case. What is the proffered evidence supposed to prove? If it is to prove merely character or propensity, it is not admissible.

In the case at bar, the state proffered the evidence that in 1977 defendant attempted to kill his then spouse as relevant to prove defendant's intent to kill another spouse six years later. The state also offered this evidence to disprove mistake or accident. We agree with the Court of Appeals that intent and absence of mistake or accident are really the same issue here. Proof of intent eliminates mistake or accident. Thus, the logical relevance theory for which the "prior crime" evidence was offered is restricted to intent. It follows that we are not discussing admissibility of the prior assault that occurred in New Zealand against defendant's former wife under any theory of motive, opportunity, preparation, plan, knowledge or identity or any other unlisted theory not set forth as an example in OEC 404(3).

Having stated that the prime issue concerned the defendant's state of mind and more specifically whether the defendant acted with intent and not by mistake or accident, the state focuses its argument on the similarity of the two acts, namely the similar classes of persons involved, to wit, spouses, and that the two assaults, one fatal, one not, were strikingly similar and involved eerie parallels. The state asserts that "the most probable inference to be drawn from the evidence is that defendant, when faced with a disintegrating marriage, reacts in a life-threatening manner against his wife."

What does that evidence prove other than propensity? If propensity to commit crime is all that the evidence

proves, it must be excluded. Is the evidence relevant to the issue of intent? Can a factfinder rationally conclude that because this defendant in 1977 threatened to kill his wife with a rifle, six years later he intentionally shot his present wife in the back of the head with a pistol? Although not conclusive, such evidence certainly could be probative to show that when similarly agitated in a domestic setting defendant will act violently and intentionally. If the defendant had killed or attempted to kill two previous spouses under similar circumstances, the evidence would be highly relevant to prove that a killing of a third spouse was not an accident.

■ Intent or state of mind is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind. Wright and Graham assert that courts realize the prosecutor's difficulty in proving *mens rea,* or criminal intent, and therefore courts very liberally admit prior crime evidence to prove *mens rea.* 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5239 (1978). Conversely, this court and other courts have held that evidence of other crimes offered to prove identity is strictly limited to crimes committed "by the use of a novel means or in a particular manner" so as to earmark the acts as the handiwork of the accused. In other words, to prove identity the prior acts must be a "signature" crime. *See State v. Manrique,* 271 Or at 208; *State v. Zimmerlee,* 261 Or 49, 53, 492 P2d 795 (1972); McCormick, Evidence, *supra.* Such rigidity is not required when admitting prior acts to prove intent or lack of mistake.

Cases in which prior crime evidence was used to prove state of mind date back to the Aaron Burr treason case, *United States v. Burr,* 25 Fed Cas 52, 54 (No. 14692h) (CC D Va 1807),[2] followed by a multitude of cases discussing the same issue, including United States Supreme Court decisions such as *Spencer v. Texas,* 385 US 554, 87 S Ct 648, 17 L Ed 2d

---

[2] In an opinion by Chief Justice John Marshall, sitting as circuit justice, the court held that it could not order the prosecution to prove the overt treasonous acts before proving treasonous intention. However, the court stated that "the intention which is considered as relevant in this stage of the inquiry is the intention which composes a part of the crime, the intention with which the overt act itself was committed — not a general evil disposition, or an intention [to commit an uncharged act]." *United States v. Burr,* 25 Fed Cas 52, 54 (No. 14692h) (DD D Va 1807).

606 (1967); *Nye & Nissen v. United States*, 336 US 613, 69 S Ct 766, 93 L Ed 919 (1949); *Wood v. United States*, 41 US (16 Pet) 342, 360-61 (1842).[3]

The many "state of mind" cases have not developed any cohesive or consistent line of reasoning for decision and caused Dean John Henry Wigmore to exclaim that in his survey of the opinions he found "bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction." 2 Wigmore, Evidence 246, § 302 (Chadbourne rev 1979). Wigmore developed his own theory of admissibility for prior crime evidence involving the issue of *mens rea*. Wigmore's logical relevance theory is based on improbability and demands proof of similarity. Imwinkelried writes that Wigmore's theory is based upon the doctrine of chances and under the doctrine the proponent uses uncharged misconduct evidence inductively and probabilistically:

> "* * * The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's

---

[3] In *Spencer v. Texas*, 385 US 554, 87 S Ct 648, 17 L Ed 2d 606 (1967), defendants challenged state recidivist statutes that allowed the prosecutor to introduce proof of a defendant's past convictions with a limiting jury instruction. The Court, noting that prior conduct testimony is "particularly probative" of intent, identity, malice, or motive, held that the statutes did not violate the Due Process Clause of the Fourteenth Amendment.

In *Nye & Nissen v. United States*, 336 US 613, 69 S Ct 766, 93 L Ed 919 (1949), the Court upheld convictions for conspiracy to defraud the United States and for filing false invoices to a federal agency, stating that "[e]vidence that similar and related offenses were committed in this period tended to show a consistent pattern of conduct highly relevant to the issue of intent." *Id.* at 618 (footnote omitted).

In *Wood v. United States*, 41 US (16 Pet) 342 (1842), claimant Wood, an importer whose goods were seized because of unpaid duties, contended that the trial judge improperly admitted evidence that claimant had used fraudulent invoices in other shipments. The Court, per Story, J., held that the evidence was admissible:

> "The question was one of fraudulent intent or not; and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment." *Id.* at *360.

act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea." Imwinkelried, Uncharged Misconduct Evidence 8, § 5:05 (1984) (footnotes omitted).

Wigmore in his magnum opus on the law of evidence graphically illustrates his theory:

"To prove Intent, as a generic notion of criminal volition or willfulness, including the various non-innocent mental states accompanying different criminal acts, there is employed an entirely different process of thought. The argument here is purely from the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.

"Thus, if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim or B's accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e. as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small; or (to put it in another way) because inadvertence or accident is only an abnormal or occasional explanation for the discharge of a gun at a given object, and therefore the recurrence of a similar result (i.e. discharge towards the same object, A) excludes the fair possibility of such an abnormal cause and points out the cause as probably a more natural and usual one, i.e. a deliberate discharge at A. In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the

normal, i.e. criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offence *according to the probability that the act could be repeated,* within a limited time and under given circumstances, with an innocent intent. The general canon of logical inference already examined is here applied and illustrated." 2 Wigmore, *supra* at 246, § 302.

Imwinkelried observes that Wigmore's theory of logical relevance does not depend on a character inference because the proponent is not asking the trier of fact to infer the defendant's conduct (entertaining a particular *mens rea*) from the defendant's subjective character. The intermediate inference is an objective likelihood under the doctrine of chances rather than a subjective probability based on the defendant's character. He outlines the theory as:

| Evidence of uncharged misconduct | intermediate inference | ultimate inference |
| --- | --- | --- |
| THE DEFENDANT'S ---- OTHER SHOTS FIRED IN THE VICTIM'S DIRECTION | OBJECTIVE IMPROB- ---- ABILITY OF ACCI- DENT UNDER THE DOCTRINE OF CHANCES | THE DEFENDANT'S MENS REA |

and concludes that the linchpin of Wigmore's argument is that "the chances of an inadvertent shooting on three successive similar occasions are extremely small." Imwinkelried, *supra,* at 10, § 5.05.

But is one prior similar incident enough to justify admission, and does the time lapse render the prior incident too remote? If defendant had attempted to kill the same spouse one year before under similar circumstances, the prior act would undoubtedly be admissible. But what about a prior similar assault six years earlier on a different spouse?

Some commentators have concluded that to resort to the probability doctrine the proponent must have evidence of more than one prior similar instance of conduct. *See* Note, *Admissibility of Evidence of Prior Crimes in Murder Trials,* 25 Ind L J 64, 68 n 23 (1949-50); Comment, *The Admissibility of Evidence of Extraneous Offenses in Texas Criminal Cases,* 14 S Tex L J 69, 96 (1973).

But Imwinkelried asserts that in terms of logical

relevance even a single similar act would increase the likelihood that a defendant acted intentionally. "So long as the defendant has performed the act 'oftener than once,' the act has some logical relevance on the issue of intent." Imwinkelried, *supra* at 12, § 5:06. Judge Ashmanskas in the case at bar was impressed by the similar reasoning of Professor William Roth in *Understanding Admissibility of Prior Bad Acts: A Diagrammatic Approach,* 9 Pepperdine L Rev 297 (1982).

■      We believe no categorical statement can be made one way or the other. Depending upon the circumstances of the case, sometimes one prior similar act will be sufficiently relevant for admissibility and sometimes not. A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify. These decisions must be made case-by-case, with the trial judge first determining whether the evidence has any probative value under OEC 401[4] as applied to intent under OEC 404(3), then deciding whether the evidence has any prejudicial effect outweighing its probativity under OEC 403. The more prior similar acts, the stronger the probative value; the fewer, the less the probative value. The same is true of the similarity of the prior acts and of the time element. The prior acts need not be identical. The greater the degree of similarity of the prior acts, the greater the relevancy; the less similarity, the less probative value. As to the time element, the closer in time of the prior act to the act charged, the greater the probative value; the more remote, the less probative value. No categorical rule controls inclusion or exclusion. To sum up, in evaluating prior crime evidence on the issue of intent or absence of mistake, the trial judge should make these determinations:

(1)    Does the present charged act require proof of intent?

(2)    Did the prior act require intent?

_____

[4] OEC 401 provides:

"  'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

(5)   Were the physical elements of the prior act and the present act similar?

(6)   If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?

In turning to the present case, we observe that the trial judge essentially followed this format. Judge Ashmanskas first examined the relevance of the evidence of the prior act on the issue of intent, referring to *State v. Mills*, 39 Or App 85, 88, 591 P2d 396 (1979), and reading from it that

> "* * * 'evidence of defendant's prior mistreatment of an assault victim is relevant because it tends to establish intent and to negate the likelihood of accident, inadvertence or self-defense. * * * [W]e have held in assault cases that evidence of prior assault acts against persons in a class with the victim are admissible for that purpose.' "

The judge compared the present case of spouses being in the same class with cases involving victims of assaults being in the same class. He then applied the doctrine of chances as set forth by Roth in *Understanding Admissibility of Prior Bad Acts: A Diagrammatic Approach, supra,* and found that the prior crime and the present crime had the mental and physical similarities, including the use of a firearm against another person in the same relationship to the defendant, and that those similarities were sufficient to apply the doctrine of chance.

The similarities between the 1977 assault and the 1983 killing included:

| 1977 (Barbara) | 1983 (Edna) |
| --- | --- |
| | |

## MENTAL STATE SIMILARITIES

| | |
| --- | --- |
| Marital discord—nagging and despondent | Marital discord—nagging and despondent |

| | |
|---|---|
| Failed to become police officer | Failed to become police officer |
| Financially dependent on spouse | Financially dependent on spouse |
| Threatened physical abuse | Threatened physical abuse |
| Threatened to kill if he could not have her as his wife | Threatened to kill if she had another man |

## PHYSICAL SIMILARITIES

| | |
|---|---|
| In the morning, armed with a previously loaded weapon, no drinking involved, entered spouse's premises, attempted to kill wife, called police, and threatened suicide | In the morning armed with a previously loaded weapon, no drinking involved, entered spouse's premises, killed spouse, called police, and threatened suicide |

After considering these similarities, the trial judge found that the "prior crime" evidence was directly relevant to the issue of state of mind, intent, and absence of mistake.

Finally, the judge engaged in the weighing process called for in OEC 403 by stating his concern that the evidence might still "blacken the defendant's character and may not be admissible if the prejudical effect outweighs the probative value." The judge also reflected that he had a duty to decide that the "inflammatory tendency of the evidence" would not be so great as to make it likely that the jury would not restrict its consideration of the evidence to the ultimate facts to which the evidence was relevant. He did observe that when the best witness, the victim, is unable to testify due to death or incompetence, the principle of necessity weighs in favor of probative value. After making these evaluations—finding the proffered evidence relevant to the issue of intent, finding similarities in the acts, finding similar physical facts and similar mental states, and applying OEC 403's balancing test—he concluded: "I am satisfied that the testimony or that evidence is admissible."

■ The Court of Appeals set forth four factors in *State v. Collins,* 73 Or App 216, 220, 698 P2d 969 (1985), that a trial judge should consider in determining whether the probative value of the evidence exceeds its prejudicial nature: (1) the need for the evidence; (2) the certainty that the other crime

was committed and that defendant was the actor; (3) the strength or weakness of the evidence; and (4) its inflammatory effect on the jury. We agree that a trial judge should consider these factors in addition to others in making this decision.

In the first step, the trial judge assesses the proponent's need for the uncharged misconduct. The trial judge is no longer concerned with the logical relevance issue under OEC 401; the judge now analyzes the quantum of the probative value of the evidence. In the case at bar, the trial judge was concerned about the need for the evidence because the only witness to the shooting was the victim, who died, and the rest of the state's case consisted of oral admissions and circumstantial evidence. There was clear need for the evidence.

In the second step, the judge determines how clearly the proponent has proven that the defendant committed the uncharged act. Here, defendant did not dispute that he had assaulted his former spouse.

Concerning the third element on the strength or weakness of the evidence, the evidence offered was powerful on the issue of intent. Intent was the key issue in the case and the prior act evidence was directly relevant to that issue.

In considering the fourth step, the judge must determine whether to exclude logically relevant evidence if it is too prejudicial or inflammatory. In this context, prejudicial has a limited meaning. Evidence is prejudicial under OEC 403 if it will tempt the jury to decide the case on an improper basis. Prior crime evidence is prejudicial if it invites the jury to resolve the case on the improper basis that the defendant is a bad person. The prior crime evidence in this case demonstrated that this defendant threatened his former spouse when he became agitated by a domestic dispute, but the circumstances were not particularly aggravating. He did not seriously hurt her and he begged forgiveness and was given misdemeanor treatment on the criminal charge. There was nothing particularly inflammatory about that episode. That evidence clearly was more relevant to the issue of intent than it would be to the question of whether defendant was a person of bad character.

There is yet a fifth step that a trial judge may

consider under OEC 403, and that is how time-consuming and distracting proof of the other crime evidence will be. In this case the trial judge determined that transporting the two witnesses from New Zealand was worth the time and effort, and that the proof of the prior misconduct would not throw the presentation of the murder case out of balance. He also gave opportunity to the defense to investigate the New Zealand episode by offering an extension of time and expenses to defense counsel.

Having considered all five factors, the trial judge exercised his discretion under OEC 403 and admitted the prior crime evidence.

After the jury heard all the evidence in the case, the trial judge properly instructed the jury that the evidence was admissible only for a limited purpose as follows:

"The State has presented evidence that the defendant was involved in an incident with his former wife in New Zealand. This evidence is only relevant to the issue of absence of mistake or accident in the present case. You may not use this prior event in New Zealand as evidence that Mr. Johns is a bad person or is not a trustworthy person, but simply give it what weight you believe it deserves on the issue of absence of mistake or accident in the present case."

■ In conclusion, although reasonable minds could differ on the admissibility of the evidence concerning the 1977 incident, we cannot say as a matter of law that the evidence was not probative on the issue of intent or that as a matter of law the probativity of the prior act evidence was substantially outweighed by the danger of unfair prejudice. We defer to the veteran trial judge who was better able to decide the evidence's effect on the jury after hearing and observing the many witnesses throughout the lengthy trial. The trial encompassed the testimony of 60 witnesses, 190 exhibits and 1,700 pages of transcript. The trial judge did not abuse his discretion in admitting this prior crime evidence.

The Court of Appeals also held that the trial court erroneously admitted other evidence of defendant's prior conduct. Seven months before the victim was shot, two women who lived in defendant's neighborhood went to his home to look at his two handguns because they were considering buying a gun. They testified that defendant explained how to

use a gun. He took the bullets out of the cylinder in their presence. He also stated that if they used the gun against a burglar to make sure the burglar was in the house and to shoot to kill, not maim. The following testimony was also elicited:

"A.   After he finished showing us the gun, and he was still explaining about it, I asked him about the importance of a safety. The guns that I had seen prior at one of the retail stores had a safety on it. And I asked him about the safety and rattled off a couple questions why it was important. And the gun at the time was in his hand and pointed towards the floor. And he raised the gun to my face and fired.

"Q.   And what happened?

"A.   It flipped me out.

"Q.   What response, if any, did he have after doing that?

"A.   He seemed to be humored by it."

The witness also testified that defendant had said, "That's why," referring to the need for a safety, when he pointed the gun at her and pulled the trigger. All of this occurred in the presence of defendant's wife.

■■   The state argues that "it is extremely noteworthy that defendant would demonstrate his attitude towards guns by pointing a gun at a woman's head and pulling the trigger, just as he did to his wife when the revolver was loaded." We reject this argument, the evidence was not logically relevant to any issue in the case. Although the trial court erred in admitting this evidence, that admission of the evidence was harmless beyond any reasonable doubt. *See State v. Mains,* 295 Or 640, 669 P2d 1112 (1983).

The Court of Appeals is reversed and the circuit court judgment of conviction is reinstated.

## APPENDIX

Roth, *Understanding Admissibility of Prior Bad Acts: A Diagrammatic Approach,* 9 Pepperdine L Rev 297, 299 (1982) ("the vast amount of literature on the subject"); *see* Krivosha, Lansworth & Pirsch, *Relevancy: The Necessary Element in Using Evidence of Other Crimes, Wrongs, or Bad Acts to Convict,* 60 Neb L Rev 657 (1981); Fallon & Bursell, *Similar Fact Evidence and Corroboration,* 1978 Crim L Rev 188; Slough, *Other Vices, Other Crimes: Kansas Statutes*

*Annotated Section 60-455 Revisited,* 26 Kan L Rev 161 (1978); Lawson, *Credibility and Character: A Different Look at an Interminable Problem,* 50 Notre Dame Law 758 (1975); Slough, *Other Vices, Other Crimes: An Evidentiary Dilemma,* 20 Kan L Rev 411 (1972); Thorp, *Previous Convictions as Evidence of Similar Facts,* 1967 Crim L Rev 4; Slough & Knightly, *Other Vices, Other Crimes,* 41 Iowa L Rev 325 (1956); Lacy, *Admissibility of Evidence of Crimes Not Charged in the Indictment,* 31 Or L Rev 267 (1952); Stone, *The Rule of Exclusion of Similar Fact Evidence: America,* 51 Harv L Rev 988 (1938); Note, 49 U Cin L Rev 163 (1977); Note, 17 Wasburn L J 98 (1977); Case Comment, 2 Fla St U L Rev 197 (1974); Comment, 36 Tenn L Rev 515 (1969); Note, 51 Marq L Rev 104 (1967); Case Note, 3 Melb U L Rev 63 (1961); Comment, 70 Yale L J 763 (1961); Case Note, 5 Kan L Rev 738 (1957); Recent Decision, 31 Notre Dame Law 717 (1956); Recent Decision, 17 Ohio St L J 351 (1956); Recent Decision, 17 U Pitt L Rev 302 (1956); Comment, 35 Marq L Rev 55 (1951); Note, 3 Vand L Rev 779 (1950); Note, 10 Modern L Rev 193 (1947); Recent Decision, 28 Calif L Rev 516 (1940); Case Note, 13 So Calif L Rev 511 (1940); Recent Decision, 23 Marq L Rev 41 (1938); Comment, 37 Mich L Rev 113 (1938).

  *See, e.g.,* Comment, *Admissibility of Other-Crimes Evidence in California,* 14 UWLA L Rev 105 (1982); Comment, *A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Offenses in California,* 7 UCLA L Rev 463 (1960); Schoumacher, *Relevancy Under the New Federal Rules and the Illinois Law,* 57 Chi B Rec 209 (March-April, 1976); Note, *Character and Reputation Evidence in Iowa,* 25 Drake L Rev 435 (1975); Note, *Evidence of Other Crimes in Kansas,* 17 Washburn L J 98 (1977); Note, *Character Evidence—The Rules of Admissibility in Criminal Cases in Kentucky,* 61 Ky L J 963 (1973); Comment, *Other Crimes Evidence in Louisiana,* 33 La L Rev 614 (1973); Comment, *Admissibility of Evidence of Prior Arrests in Louisiana Criminal Trials,* 19 La L Rev 684 (1959); Comment; *Evidence of Other Crimes as Substantive Proof of Guilt in Maryland,* 9 Balt L Rev 245 (1980); Note, *Evidence of Defendant's Other Crimes: Admissibility in Minnesota,* 37 Minn L Rev 608 (1953); Note, *Evidence of Other Crimes in Montana,* 30 Mont L Rev 235 (1969); Strom, *Proposed Relevancy Rules Generally Restate Law,* 53 Neb L Rev 365 (1974); Carey, *The*

*Exclusion of Evidence of Other Crimes in New York,* 13 NYU Intra L Rev 101 (1958); Note, *Admissibility of Similar Crimes: 1901-1951,* 18 Brooklyn L Rev 80 (1951); Herbert & Mount, *Ohio's "Similar Acts Statute": Its Uses and Abuses,* 9 Ark L Rev 301 (1975); Thomas, *Looking Logically at Evidence of Other Crimes in Oklahoma,* 15 Okla L Rev 431 (1962); Note, *Evidence: Admissibility of Other Offenses in Oklahoma,* 13 Okla L Rev 68 (1960); Reiser, *Evidence of Other Criminal Acts in South Carolina,* 28 SC L Rev 125 (1976); Johnson, *The Admissibility of Evidence of Extraneous Offenses in Texas Criminal Cases,* 14 S Tex L J 69 (1973); Chesnutt, *The Admissibility of Other Crimes in Texas,* 50 Tex L Rev 1409 (1972); Student Note, *Admissibility of Evidence of Similar Offenses in Criminal Prosecutions in West Virginia,* 54 W Va L Rev 142 (1951).

*See, e.g.,* White, *Evidence of Other Crimes, Wrongs or Acts Under Federal Criminal Evidence 404(b); Some Unanswered Questions,* 21 ATLA L Rep 117 (1978); Orfield, *Relevancy in Federal Criminal Evidence,* 43 Neb L Rev 485 (1963); Comment, *Federal Rules of Evidence—Rule 404(b) Limits the Admission of Other Crimes Evidence, Under an Inclusionary Approach, to Cases Where It is Relevant to an Issue in Dispute,* 55 Notre Dame Law 574 (1980); Comment, *The Jurisprudence of Similar Acts Evidence in the Eighth Circuit,* 48 UMKC L Rev 342 (1980).