Argued and submitted February 6, 2009, affirmed March 3, petition for review denied July 8, 2010 (348 Or 523)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MOJI MOMENI,
*Defendant-Appellant.*

Washington County Circuit Court
C060992CR; A134490

227 P3d 1230

Stephen A. Houze argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges, and Edmonds, Senior Judge.

EDMONDS, S. J.

Wollheim, J., dissenting.

## EDMONDS, S. J.

Defendant appeals a judgment of conviction for two counts of sexual abuse in the second degree, ORS 163.425 (2005), and one count of sexual abuse in the third degree, ORS 163.415 (2005).[1] On appeal, he makes two assignments of error regarding the admission of testimony of two witnesses, R and K, regarding the circumstances of their encounters with defendant. We affirm.

Defendant was the landlord of an apartment complex, and B, the victim in this case, was a tenant who lived in the complex. At trial, B testified that, in December 2005, she was late in paying her rent, and after being served a notice of eviction by defendant, she went to his office to discuss the circumstances of her tenancy. According to B, when she entered defendant's office, he locked the door behind her and began asking her personal questions about her husband and children. Defendant also complimented her on her smile. B attempted to redirect the conversation, but defendant asked for a hug. B complied with defendant's request and walked over to give him a hug. However, defendant then engaged in sexual activity with B after which he informed her, "[D]on't worry. I'm sure everything's going to be fine with the rent." B testified that she resisted defendant's actions by saying "no" and unsuccessfully trying to pull away from him.

Defendant did not dispute that sexual contacts had occurred between him and B. Rather, the issue framed by the parties at trial was whether B consented to defendant's sexual acts. For example, in his opening statement, defendant

---

[1] ORS 163.425(1) (2005) provided:

"A person commits the crime of sexual abuse in the second degree when that person subjects another person to sexual intercourse, deviate sexual intercourse or, except as provided in ORS 163.412, penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor and the victim does not consent thereto."

ORS 163.415(1) (2005) provided, in part:

"A person commits the crime of sexual abuse in the third degree if the person subjects another person to sexual contact and:

"(a) The victim does not consent to the sexual contact * * *[.]"

As relevant to the facts of this case, "sexual contact" means "any touching of the sexual or other intimate parts of a person * * * for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6) (2005).

argued that B initiated the sexual activity to induce defendant to make favorable arrangements regarding B's past due rent. In order to refute defendant's claim that B had consented to defendant's sexual contacts, the state offered the testimony of K and R. The admission of their testimony, over defendant's objection, is the source of defendant's assignments of error on appeal.

K testified as follows: Defendant was K's landlord between February 2005 and November 2005. K lost her job and was unable to pay her rent. Because she "didn't have any way of paying the rent," she asked defendant if she could clean apartments, mow lawns, or to do a similar type of work for him to earn income to pay her rent. Defendant told her that he did not have any jobs, but asked her to stop by after hours to "see what he could do." K, however, did not respond to defendant's invitation. Thereafter, on several occasions, defendant stopped by her apartment and left his business card in her door. On one occasion, when she was home, she permitted defendant to enter her apartment. Defendant asked K why she had not stopped by to see him. When K's boyfriend unexpectedly entered the room and greeted defendant, defendant appeared to be surprised and "set back" by the realization that K was not alone in the apartment. Defendant then left hurriedly.

Later, K stopped by defendant's office unannounced to again address the subject of her past due rent. As she walked into the office, "he put his hand on my butt and kind of like went ahead and pushed me in there." Defendant locked the door behind her by turning the deadbolt. He then sat down next to her and placed his hand on the arm of her chair. K felt uncomfortable because defendant had positioned himself so close to her. Defendant and K then negotiated over the payment of the past due rent for about 10 minutes and agreed on a payment plan. Defendant then asked for a hug and hugged her "real tight."

K testified that, prior to the above occasion, defendant had asked for hugs on approximately four other occasions after agreeing to waive late fees on her rent obligations and had then hugged her in a similar manner. According to K, "[i]t was always real tight, and then he'd let me go, and I

left." K characterized defendant's conduct of asking for hugs initially as "him being friendly," but

> "near the end was when I realized that it's just not—I don't—it was creepy. And that was—and that was about the time I moved out. I was, like, 'I don't want to be here anymore, Moji.' And he told me, well, I owe him all this money, and that was the only way that I could move out. So, I borrowed money from my parents and gave it to him, and—so I could get out of there."

The state's other witness, R, who was defendant's tenant between November 2003 and April 2004, testified to the following: On one occasion, she left her apartment to buy pizza, leaving the door unlocked. When she returned, the door was locked. Finding herself locked out of her apartment, R went to defendant's office to ask for help in unlocking her door. Defendant agreed to help her, and, as he walked with her back to her apartment, he twice placed his hand on her lower back and rubbed it in a circular motion for a couple of seconds. When they arrived at the apartment, defendant unlocked the door and walked into the apartment, purportedly for the purpose of checking for intruders. Defendant asked R when her husband would be returning to the apartment, and R replied that she did not know. Defendant then rubbed her shoulders and hugged her a few more times. Defendant then indicated that he was going to make certain there were no intruders in R's bedroom. However, while he was just outside the door to the bedroom, he pulled R close for a hug. R believed that defendant was trying to pull her into the bedroom. R also testified that defendant's hugs were initiated by him and that she had not invited his actions. After defendant left the apartment, R told her husband what had occurred, and they moved out of the apartment.

■■ Defendant objected to the admission of K's and R's testimony on the ground that the evidence was inadmissible character or propensity evidence under OEC 404. The state countered that the evidence was probative to rebut defendant's attack on B's credibility and to show that she did not consent to his sexual contacts. According to the state, the testimony of K and R demonstrated a pattern of conduct in which defendant had attempted to take advantage of former female tenants by initiating sexual contact with them. The

trial court ruled that the evidence was admissible under OEC 404(4). It explained, in part,

> "I will note the points of similarity include that the individuals that were involved in the proffered events were all female, younger women. They were alone when the alleged incidents took place. They were tenants of the defendant. The events occurred in the same general location, that is, at the residence and apartment complex. The—there was some discussion regarding about, in similarity, about where their boyfriends or husbands were, their whereabouts at the time that those events were taking place. And they were all in trouble. There was all some kind of trouble going on, and crisis going on at the time that these things were happening."

On appeal, the parties reiterate their arguments regarding the admissibility of the evidence under OEC 404, which governs the admissibility of uncharged prior misconduct evidence. In particular, OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

As a general rule, evidence of a defendant's other crimes, wrongdoing, or bad acts are not admissible in a criminal case to prove the person's criminal propensity. However, such evidence may be admissible to prove or disprove other facts that are relevant in a case so long as the relevance of the evidence does not ultimately rely on an inference relating to the defendant's character or propensity. *State v. Johnson*, 340 Or 319, 338, 131 P3d 173, *cert den*, 549 US 1079 (2006). OEC 404(3) is an "inclusionary" rule. As the court explained in *Johnson*,

> "That means that, while the rule sets out a list of possible 'exceptions' to the general prohibition on prior bad act evidence ('motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident'), the rule does not purport to cover every imaginable purpose to which prior bad act evidence might logically and lawfully be applied. *Thus, the essential inquiry under OEC 404(3) is not whether the testimony can be made to fit into one of the listed*

*categories, but when and how it is logically relevant to a noncharacter issue in the case."*

340 Or at 338 (citations omitted; emphasis added).

 OEC 401 defines "relevant evidence" as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 404(3) does not require the state to demonstrate that the testimony squarely qualifies under one of the listed categories in the statute, or that it demonstrates a distinctive methodology, or even that the uncharged acts closely replicate the crimes that are the subject of the indictment against defendant such as would be required to admit evidence of other wrongful acts in order to prove the identity of the perpetrator. *Johnson*, 340 Or at 340. Nonetheless,

> "any similarity in the circumstances increases the probative value of the prior crime evidence and enhances the argument for admissibility under OEC 404(3). Likewise, the timing of uncharged crimes *vis-à-vis* the charged crime and the number of instances that are shown may affect the question of admissibility. No categorical rule exists, but timing, repetition, and similarity of both the act and the surrounding circumstances all are important considerations."

*Id.*

In support of its argument for admissibility under OEC 404(3), the state points to the following similarities of defendant's contacts with B, R, and K. All three women were defendant's tenants during the time that he initiated sexual contact with them, and the contacts all occurred at the same apartment complex within the same general time period. The trial court found that all of the individuals were younger women and by themselves when the incidents took place. Both B and K were behind on their rent when the contacts with defendant occurred. R contacted defendant for assistance because she had been locked out of her apartment, and when the apartment door was unlocked, he followed her into the apartment, purportedly to check for intruders. When defendant met with B and K in his office, he locked the door behind them after they had entered the office. In each

instance, the ostensible reason for the encounter was related to defendant's role of landlord, but he subsequently initiated physical contact with each person by hugging them or asking them for a hug.

In *Johnson*, the court held admissible the testimony of four witnesses that defendant had sexually abused them after incapacitating them with intoxicants. The court explained that

> "[t]he testimony of those witnesses demonstrated that defendant had developed a method for obtaining sexual access to women without their consent (which method involved administration of incapacitating drugs, commonly liquid morphine) and permitted the jury to infer that the victim, like others, had not consented to the sexual contact with defendant[.]"

340 Or at 341. While the factual circumstances in *Johnson* differ significantly from the circumstances in this case, the holding in *Johnson* demonstrates the general proposition that other prior bad acts by a defendant can be probative regarding the issue of whether the person consents to sexual contact with the defendant.

■ In light of the holding in *Johnson*, we turn to the issue of the admissibility of K's and R's testimony in this case. We first consider whether the testimony satisfies the relevancy requirement under OEC 401. *State v. Chavez*, 229 Or App 1, 210 P3d 259, *rev den*, 347 Or 365 (2009). We conclude that the evidence satisfies the minimal requirements for relevancy in OEC 401 because it has the tendency to make B's testimony more credible and to refute defendant's claim that she consented to his actions.

■■ Relevancy, by itself, however, is not enough to render the evidence admissible under OEC 404(3).[2] In that provision, the legislature has expressly declared that character or propensity evidence is not admissible to show that a defendant acted in conformity with his or her prior bad acts. Thus, evidence that otherwise might satisfy the requirements of

---

[2] We are mindful that OEC 404(4) provides that evidence of other crimes, wrongs, or acts by a defendant is admissible, if relevant, subject to exceptions not applicable here.

OEC 401 is not admissible under OEC 404(3) if its only tendency is to show that the defendant is the kind of person who has a propensity to do evil. *See, e.g., State v. Pratt*, 309 Or 205, 210, 214, 785 P2d 350 (1990). Rather, the evidence must also be sufficiently probative of an exception to the general rule of nonadmissibility of character propensity evidence in order to effectuate the legislature's intent underlying OEC 404(3). *Johnson*, 340 Or at 339.

■ ■ We believe that the debate in this case between the majority and the dissent, when properly framed, is whether R's and K's testimony is sufficiently probative of an issue other than character or propensity. If the only tendency of the disputed evidence is to show that defendant is the kind of man who sexually attacks women, then the legislature clearly intends that the evidence be excluded. On the other hand, if the evidence is consistent with the legislature's intent to authorize the admission of prior bad acts evidence that is probative of other disputed fact issues, then the testimony should be admitted to fulfill the legislature's intention. We believe the legislature's dual intentions in that regard are resolved in *Johnson* by requiring that the evidence be sufficiently probative for a purpose other than character or propensity. If a reasonable trier of fact could only consider the evidence as propensity or character evidence, then the evidence should be excluded under OEC 404(3). If, however, a reasonable trier of fact could also draw from the evidence a rational inference that does not rely on the defendant's character or propensity to do evil, then the evidence is properly admissible. *See Johnson*, 340 Or at 338 ("such evidence may be admissible to prove *other* facts that are relevant in the case, as long as the claim of logical relevance connecting the evidence to the 'other' fact or facts does not ultimately rely on an inference relating to the defendant's character or propensities") (emphasis in original).

■ Such a test is consistent with the prior case law under OEC 404(3). For example, before evidence of other crimes is admissible to prove the identity of a perpetrator, a high degree of similarity between charged and uncharged crimes is required to diminish the potential that the trier of fact may conclude that the defendant is the perpetrator because he is a bad person. *State v. Pinnell*, 311 Or 98, 109-10, 806 P2d 110

(1991). In contrast, when prior crime evidence is offered to prove the element of intent, a high degree of similarity is helpful, but is not essential, and evidence of a distinctive methodology is irrelevant. *State v. Johns*, 301 Or 535, 555-56, 725 P2d 312 (1986). Thus, the requirements for admissibility under OEC 404(3) ultimately depend on the particular circumstances in the case and what disputed fact the evidence is offered to prove. These considerations must be made in light of the legislature's intention to exclude prior bad acts evidence except when offered for purposes other than character or propensity.

▪ Here, as in *Johnson*, there is no requirement under OEC 404(3) that evidence of defendant's prior wrongs demonstrate a distinctive methodology or a signature crime. However, it is essential that the uncharged crimes evidence support the narrow inference that the state seeks to draw from it. *Johnson*, 340 Or at 340. In this case, R's and K's testimony demonstrates defendant's method of manipulating his landlord-tenant relationship with other female tenants to place them in circumstances where they were vulnerable to his sexual advances. In *Johnson*, the evidence "demonstrated that defendant had developed a method for obtaining sexual access to women without their consent[.]" 340 Or at 341. The evidence regarding other victims in *Johnson* permitted the jury to properly infer that the victim, like other victims, had not consented to the sexual contact with the defendant. In this case also, the trier of fact could properly infer that B, like R and K, had not initiated or consented to defendant's sexual advances as defendant argued, but rather, as he did with R and K, defendant used the leverage of his landlord relationship to put B in a position where she was alone and vulnerable to his sexual advances. It follows that the trial court did not err in admitting their testimony under OEC 404(3) as relevant to and probative of the issues of B's credibility and whether she initiated or consented to defendant's sexual contacts with her.

Affirmed.

**WOLLHEIM, J.,** dissenting.

The issue presented by this case is whether the rule stated by OEC 404(3)—that "[e]vidence of other crimes,

wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith"—makes the testimony of R and K regarding defendant's prior uncharged crimes inadmissible. That rule "unquestionably forbids the admission of evidence solely to show propensity or that the defendant is a bad person." *State v. Johns*, 301 Or 535, 548-49, 725 P2d 312 (1986). Thus, prior bad act, or character, evidence is admissible only if it is both "relevant and probative of something other than a disposition to do evil." *State v. Pratt*, 309 Or 205, 210, 785 P2d 350 (1990). The state, as the party offering the evidence, bears the burden of proof. *Id.* In order to satisfy that burden, the state must prove that defendant's uncharged crimes are sufficiently similar to the charged crime as to establish a "chain of logical relevance" that *connects* the prior act to the charged act in a manner that does not depend on an inference about defendant's character or propensities. *State v. Johnson*, 340 Or 319, 338, 131 P3d 173, *cert den*, 549 US 1079 (2006). Because the state has not satisfied that burden, I respectfully dissent.

The majority finds the testimony of K and R to be logically connected to whether B consented to the sexual contact alleged in this case. But the majority does not describe the charged *crime* in its opinion. Defendant was charged with committing the following acts: when B gave defendant a hug, defendant held on longer than B expected; defendant then kissed B's neck, face, and lips and pushed his hand under her bra to touch her breasts; B said "no" and tried to pull away, but defendant unbuttoned and unzipped B's pants and put his finger in her vagina; defendant pushed B down to her knees causing his penis to come into contact with her breasts, put his penis into her mouth, and forced her to perform oral sex on him.

In contrast, defendant's prior uncharged contacts involving K were that defendant "put his hand on [her] butt" to push her into his office on one occasion and that he had hugged her "real tight" on approximately four occasions.[1] His

---

[1] The majority quotes K for the proposition that defendant would not allow her to move out without paying back the money that she owed him. 234 Or App at 197. Further explanation is in order. K admitted that she had owed defendant $410. K explained that she had submitted a rental application for another apartment but that the application was denied because she owed defendant money.

prior uncharged contacts with R were that he twice rubbed her lower back with his hand for a couple of seconds, rubbed her shoulders, and hugged her in a manner that R believed suggested that defendant wanted to pull her into her bedroom.[2]

The majority relies on the Supreme Court's opinion in *Johnson* for the "proposition that other prior bad acts by a defendant *can be* probative regarding the issue of whether the person consents to sexual contact." 234 Or App at 200 (emphasis added). But it is a truism that *Johnson* applies only to the specific facts of that case. *Johnson* did not state a "bright line" rule, and the line between inadmissible character evidence and admissible evidence is narrow. That distinction depends on the specific facts of each case.[3] Thus, the holding in *Johnson* is limited and must be evaluated within its factual context. For that reason, I recite the facts from *Johnson* in some detail.

In *Johnson*, the defendant was charged with murdering, raping, and sexually abusing a teenage girl. 340 Or at 339 n 12. The forensic pathology report indicated that the victim had died from strangulation, had a significant amount of morphine in her system at the time of death, and had had sexual intercourse with the defendant shortly before she died. *Id.* at 321-22. The state sought to introduce testimony by various young women that the defendant had given them "alcohol, morphine, or other drugs that caused them to black out or become ill" as probative of whether the victim was so incapacitated as to have been incapable of consenting to sexual intercourse. *Id.* at 337. The testimony included statements that the defendant had administered drugs such as morphine to them, that those drugs caused them to become

---

K recalled that defendant would not tell her prospective landlord that she did not owe defendant money until she paid her debts. That was why K borrowed money from her parents to pay defendant. In that context, I do not understand how that portion of K's testimony is at all relevant to the issue in this case.

[2] The majority describes defendant's actions with K and R as "initiat[ing] sexual contact." 234 Or App at 199. ORS 163.305(6) defines sexual contact. The majority's use of the phrase sexual contact is not consistent with the statutory definition, and it is confusing.

[3] In contrast to Shakespeare who wrote "What's in a name? That which we call a rose by any other name would smell as sweet," William Shakespeare, *Romeo and Juliet*, act 2, sc 2, inadmissible character evidence can become admissible plan evidence. It all depends on the disputed issues in the charged case.

incapacitated, and that defendant sexually abused them while they were so incapacitated. One woman had awakened while the defendant was having intercourse with her. *Id.* at 341.[4]

The Supreme Court stated that the similarities between, and the multiplicity of, the defendant's prior bad acts and the charged crime suggested a pattern and allowed a logical inference that the defendant administered the morphine to cause the victim's incapacity to consent to intercourse. *Id.* at 339, 342. The court concluded that, in order to admit the evidence under the facts of that case, it was "essential that the uncharged crimes evidence involve a method of incapacitation (administration of an intoxicating substance) that would support the narrow inference that * * * sexual contact between [the victim] and [the] defendant occurred while [the victim] was incapacitated by morphine that [the] defendant had administered." *Id.* at 340. However, the court did not conclude, as the majority asserts, that evidence that a defendant had a method of obtaining sexual access to women without their consent was not only *essential*, but also *sufficient*, to satisfy the state's burden of proof under OEC 404(3) in *other* circumstances.

The majority acknowledges that "the factual circumstances in *Johnson* differ significantly from the circumstances in this case." 234 Or App at 200. In light of those differences and in the absence of any explanation, the majority's assumption—that defendant had a method of obtaining sexual access to women without their consent—that controls the outcome in *this* case is both perplexing and wrong.

The analytical framework set forth in *Johnson* demonstrates that the admissibility of character evidence for the purpose of showing a lack of consent to sexual behavior depends on a comparison of the uncharged prior misconduct to the charged crime. The requisite degree of similarity between the uncharged and charged crimes depends on the purpose for which the evidence is offered. For example, the

---

[4] The defendant in *Johnson* did not separately assign error to the admission of each witness's prior bad act testimony. Accordingly, the court could not distinguish the admissibility of the testimony of any one of the challenged witnesses. *Johnson*, 340 Or at 337.

court observed that character or prior misconduct evidence to prove identity based on *modus operandi* is admissible only if it demonstrates a "methodology that is highly distinctive" and bears a "very high degree of similarity" to the charged crime. *Id.* at 339 (citing *State v. Pinell*, 311 Or 98, 109-10, 806 P2d 110 (1991)). In contrast, the court observed that no such "distinctive methodology" must be shown when prior bad act evidence is offered for the purpose of showing a defendant's intent. *Id.* at 339-40 (citing *Johns*, 301 Or at 555-56). Ultimately, the court concluded that the analysis required for the admissibility of the prior bad act evidence offered in *Johnson* for the purpose of showing a lack of consent to sexual contact "falls somewhere in between *Pinell* and *Johns.*" *Id.* at 340.

Thus, the court in *Johnson* established that character evidence offered for the purpose of showing a lack of sexual consent cannot be admissible without demonstrating the degree of similarity required under *Johns*. The *Johns* analysis depends on evaluating both the quality of the similarities between uncharged and charged acts as well as any differences:

> "[S]imilarities cannot be considered in a vacuum. The circumstances of each crime as a whole must be compared. First, the trial judge must find that there are significant similarities in the physical elements of the two crimes. If that test is met, then the trial judge must consider the differences between the physical elements of the two crimes. The differences may be minimal—for example, the offender may have used different words to indicate his [or her] intent. On the other hand, the differences may be so great that they overwhelm the similarities. The point is: *The dissimilarities must be as fully considered as the similarities* in answering this question.
>
> "Determining what constitutes a significant similarity is a matter to be decided on a case-by-case basis. Some similarities are so common as to be trivial (for example, the offender spoke English during both crimes) while others may be so unusual as to be significant even standing alone (for example, the offender spoke a foreign language when he intended to rape, but spoke English otherwise). Most often the significance of the similarities will arise out of their combination."

*Pratt*, 309 Or at 214 (interpreting *Johns*) (emphasis added).

In analyzing the significant similarities and dissimilarities of the challenged testimony to the charged acts, *Johns* provides a set of analytical questions to guide the inquiry. One of those questions is whether "the *physical elements* of the prior act and the present act [are] similar." *Johns*, 301 Or at 556 (emphasis added).[5] The stringency of that analytical framework, while more relaxed than the very stringent requirements for *modus operandi* evidence under *Pinell*, is nonetheless substantial.

For example, in *Pratt*, the Supreme Court rejected the state's argument that evidence of the defendant's prior rape and kidnapping of his ex-girlfriend was admissible character evidence in his trial on charges of aggravated murder committed in the course of an attempted rape. 309 Or at 214-15. In both the prior crime and the charged crime, the victims were transported from Washington to Oregon, the victims were sexually assaulted, and, during the commission of both crimes, someone was bound and gagged with duct tape and paper towels. *Id.* at 213. But the prior crime and the charged crime were also different in significant measure: The prior crime involved an abduction, a gun, a rape in a motel during an interruption in the trip, no other serious injuries, and the witnesses to the abduction, not the rape victim, were bound and gagged; the charged crime involved no abduction, no guns, evidence of a rape in a truck or by the side of a road, brutal injuries, and the murder victim was bound and gagged. *Id.* at 214. The Supreme Court concluded that, in light of those differences, the evidence showed only that the "defendant is the sort of man who commits rape" and was not otherwise probative of his intent to rape as charged. *Id.* Similarly, in *State v. Bunting*, 189 Or App 337, 343, 76 P3d 137 (2003), we held that the physical elements of the defendant's prior misconduct of having intercourse with a 14-year-old girl were not sufficiently similar to the charged act of touching a 14-year-old girl's clothed breast to be admissible as probative of intent. As another example, in *State v. Dibala*, 161 Or App 99, 105-06, 984 P2d 302 (1999), *rev den*, 332 Or 632 (2001),

---

[5] The other questions include whether the present charged act and the prior act both require proof of intent, whether the victim is in the same class as the victims from the prior acts, and whether the type of prior act is the same as or similar to the acts involved in the charged crime. *Johns*, 301 Or at 555-56.

we concluded that the defendant's prior conduct of touching the victim's clothed genitals with his hands was too dissimilar from the charged conduct involving rubbing the victims' clothed buttocks with his erect penis to be admissible as intent evidence.

From that body of case law, it is apparent that the degree of factual similarity must be both substantial and outweigh any factual differences. Where both criteria were satisfied in *Johnson*, the similarities between the uncharged and charged crimes provided the court with the necessary logical connection between the prior crime evidence and the charged crimes to allow the admissibility of the character evidence. 340 Or at 342. It is that same criteria that the state must prove to allow admissibility of the character evidence in this case.

Here, defendant's prior misconduct toward K and R share the following similarities with his charged crime toward B:

- All three women were tenants of defendant's and met with him, alone, when they were in need of his assistance in his capacity as landlord.

- All three women were described by the trial court as "younger."

- Both B and K testified that defendant locked the door to his office prior to their meetings.

- All three women claim that defendant engaged in unwanted physical contact with them without their consent.

However, for the evidence of the prior acts to be admissible, the state has the burden to show that those similarities are significant and outweigh any differences. As an initial matter, the fact that B, K, and R were all women tenants who met with defendant *in his capacity as landlord*, when they were in need of assistance and alone, is unremarkable. Landlords frequently meet with their tenants alone to discuss their tenants' individual needs. In addition, the circumstances prompting the meetings are different in each case. B scheduled a meeting with defendant to discuss an eviction notice for her failure to pay rent. K arrived in defendant's office

unannounced to talk about her difficulties paying rent, and R arrived unannounced because she was locked out of her apartment. Furthermore, both K and R testified that defendant initially resolved their problems—by negotiating a payment plan with K and by assisting R in opening her locked door—but the state's theory in the charged crime was that defendant immediately began asking personal questions of B without addressing the purpose of her visit to his office. On that record, the similarities across defendant's meetings with his three tenants are not "so unusual as to be significant even standing alone" (such as if defendant spoke to only B, K, and R in a foreign language). *Pratt*, 309 Or at 214. Rather, we must examine the similarities in combination with the other attending circumstances.

The additional fact that all of the women were "younger" is also not helpful to the state. At the time of trial, defendant was 50 years old. B was 38 years old, and the ages of R and K are not established in the record. Within that context, the fact that the three tenants were "younger" is not so unique as to satisfy the state's burden for admissibility. Further, that defendant locked the door by turning a deadbolt when both B and K met with him in his office may be disturbing, but the record establishes that the door could be opened from inside the office without assistance, and nothing in the record provides any specific explanation for why defendant locked the door in that manner.

I turn then to the physical elements of the prior misconduct and the charged crime. The point of greatest similarity is that defendant hugged all three women. But, defendant was not *charged* with hugging B. In fact, B testified that she consented to that hug: she walked around his desk to give him the hug. Otherwise, defendant's physical contact with each of the three women was:

- Defendant "put his hand on [K's clothed] butt and kind of like went ahead and pushed" her into his office before negotiating with K over past-due rent and before locking the office door.

- Defendant twice rubbed R's "lower back" for a couple of seconds while walking to her apartment and rubbed her shoulders after they were both inside her apartment.

- After hugging B, defendant kissed her neck, face, and lips; he pushed his hand under her bra to touch her breasts; B said "no" and tried to pull away, but defendant unbuttoned and unzipped B's pants and put his finger in her vagina; defendant pushed B down to her knees causing his penis to come into contact with her breasts, put his penis into her mouth, and forced her to perform oral sex on him.

The majority does not discuss the factual differences in the physical elements between K's and R's testimony and defendant's charged crimes.

We have refused to admit character evidence based on similar differences. For example, in *Bunting*, we distinguished intercourse from touching of a clothed breast. In *Dibala*, we distinguished a defendant's touching of the victim's clothed genitals from the charged conduct of rubbing the victim's buttocks with his penis.

Similarly, here, the state has introduced no evidence that defendant's physical contacts with K and R involved anything more than momentary touchings over clothing. To be sure, unconsented sexual contact of that nature may be criminal. ORS 163.415(1)(a)(A); *see also State v. Woodley*, 306 Or 458, 463, 760 P2d 884 (1988) (defining sexual contact of "intimate body parts of a person"); *State v. Williams*, 96 Or App 543, 544, 773 P2d 25, *rev den*, 308 Or 198 (1989) (touching of buttocks may be sexual contact). However, sexual contact of an intimate body part encompasses a wide range of misconduct—from momentary touching of an intimate body part over clothing to prolonged skin-to-skin genital contact. *See State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009) (discussing ORS 163.427). The analysis of similarity under OEC 404(3) requires a comparison not of the *offenses* but of the physical elements of the criminal *acts*. *Johns*, 301 Or at 556. Where, as in this case, the physical elements of the prior acts involve only momentary touching over clothing and the physical elements of the charged acts involve prolonged genital contact, the state has not satisfied its burden to establish a sufficient similarity to warrant admissibility of the prior misconduct evidence. The majority cites to no cases in which prior misconduct evidence so dissimilar to the charged crimes was deemed admissible character evidence; the majority also

presents no reason to create a new standard for assessing the admissibility of that character evidence.

In sum, there is no logical chain of relevance that connects the testimony of K and R to the issue whether B consented to the sexual contact alleged in this case. Rather, the prior bad act evidence serves the sole purpose of establishing, as K testified, that defendant had previously engaged in "creepy" behavior. That evidence serves solely to suggest that defendant had the propensity or bad character of someone who would commit different sexual crimes at a later time. Thus, the state has failed to meet its burden of proof in this case, and I conclude that the evidence is inadmissible under OEC 404(3).

I respectfully dissent.

Armstrong and Sercombe, JJ., join in this dissent.