Argued and submitted January 28, remanded for resentencing;
otherwise affirmed April 27, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON EDWARD KLONTZ,
*Defendant-Appellant.*

Marion County Circuit Court
08C40935; A141178

256 P3d 138

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Attorney in Charge, Criminal Appeals, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Rene C. Homes, Senior Assistant Attorney General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant, who was convicted of first-degree rape, ORS 163.375, and furnishing alcohol to a minor, ORS 471.410, argues on appeal that the trial court erred in admitting evidence under OEC 404(3) of sexual offenses that he previously committed against five other victims. As explained below, we reject that argument and affirm defendant's convictions. We reject without discussion defendant's argument that the trial court erred in failing to grant a motion for judgment of acquittal on the rape charge. *See generally State v. Marshall*, 350 Or 208, 253 P3d 1017 (2011) (describing "forcible compulsion" aspect of sexual offense). Defendant also raises several challenges concerning his sentencing. First, he argues that the trial court erred in imposing a departure sentence based on a "substantial and compelling" standard of proof, rather than proof "beyond a reasonable doubt." For the reasons explained below, we reject that argument. Defendant also argues, and the state concedes, that the court erred in imposing a compensatory fine; we accept the state's concession with respect to that error. We therefore affirm defendant's convictions and remand for resentencing.

Because defendant was convicted after a trial to the court, we state the facts in the light most favorable to the state. *State v. Gibson*, 338 Or 560, 562, 113 P3d 423, *cert den*, 546 US 1044 (2005). The victim, F, who was 18 years old, was introduced by her roommate to defendant, who at that time was a student at Corban University in Salem. In the spring of 2007, defendant contacted the victim through her MySpace page, indicating that he wanted to "hang out" with her. The victim initially indicated that they might see each other again when he saw her roommate. Defendant's responses indicated that he wanted to see the victim without the roommate being present. After a number of e-mail and text message exchanges, they agreed to go to a movie. The victim picked up defendant at Corban University and drove to the theater. Before they entered the theater, defendant indicated to the victim that he had brought alcohol to consume in the theater, and he proceeded to mix juice with liquor, which he put into water bottles and brought into the theater. During the movie, defendant encouraged the victim to drink and,

when she finished her first bottle, he left briefly to obtain more alcohol for her.

By the time they left the theater, the victim was intoxicated. She realized that she should not drive and asked defendant to drive her home, telling him that he could take her car afterwards to drive himself back to the college. Instead of driving the victim home, defendant drove her to the college and took her to his dorm room. Because of her level of intoxication, the victim did not remember the ride to the college or going to defendant's dorm room. While in defendant's dorm room, defendant suggested that they play cards and that, if the victim lost the game, she should kiss defendant. The victim told him, "no," but he lifted her up by her shoulders and kissed her. The victim told him "don't even try it" and "don't do it again." The victim then lost consciousness, and she woke up to find that the volume of the music had been turned up very loud, that she was on defendant's bed and that defendant was on top of her, having sexual intercourse with her. She struggled, but her shoulders were pinned to the bed and her hands were crossed over her chest, so she was unable to break free. She told defendant "no," but he did not stop.

When defendant finished, he threw the victim's pants at her, escorted her down the stairs, set her down outside of the dormitory, and left. The victim eventually found her car and attempted to drive away, but soon realized that she was too intoxicated to drive and had friends come to pick her up. When the victim returned home, her roommate questioned her about whether she had been raped. She replied that she had, and her roommate called the police.

Defendant was charged with rape by means of forcible compulsion. His theory of the case at trial was that the victim had consented to sexual intercourse with him. In order to rebut defendant's consent theory, the state sought to introduce evidence of five other sexual encounters that defendant had had with girls or young women. Four of those encounters took place while defendant was a college student, within a year of the incident here; the fifth encounter took place approximately seven years earlier, when defendant was in

the eighth grade. As described below, the trial court admitted evidence of all five encounters.

With regard to the first encounter, B testified that, in the fall of 2007, she travelled with a friend to Corvallis to attend a party at defendant's house. When she arrived, defendant invited her to help herself to alcohol; defendant then left to obtain more alcohol. B drank a significant amount of alcohol during the ensuing hour and became very intoxicated. She passed out on a couch, awoke to find defendant leading her upstairs to his room, and then blacked out again. She regained consciousness briefly to find herself in defendant's bed, lost consciousness again and, when she regained consciousness, defendant was having sexual intercourse with her. She passed out again, then awoke to find another girl, C, tending to her, telling her that she was very sick, and trying to keep her from passing out again. B heard defendant telling C to "take care of her." B lost consciousness again, then regained consciousness to discover that defendant was touching her vagina and that C was still present and was telling defendant, "I can't do this" or "I won't do this." B heard defendant and C engage in what sounded like a sexual encounter in the closet of the room. B then found her clothes and returned to the living room of the house, where she remained visibly upset until her friend was located, after which the friend drove her home. Defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of B in exchange for the dismissal of more serious charges.

With regard to the second encounter, C, the girl who had attempted to assist B as described above, testified that she had been drinking at the party and was intoxicated. At one point, she went to the bathroom and, as she was returning, heard B crying and hyperventilating in defendant's room. She had not known B before that evening. C was concerned that B was suffering from alcohol poisoning, so C went downstairs to find defendant. They returned to defendant's room, where B was still present, and defendant began kissing C. C attempted to push him off and said "no." Defendant pushed C into a closet, where she fell down, and defendant removed her pants while she continued to say "no." She explained that her initial objection was to defendant kissing

her in B's presence. She further explained that she objected when defendant removed her pants and that she did not want to consent to "anything below the waist," because she was a virgin. Defendant replied that he did not care. B had left the room while defendant and C were in the closet. Defendant brought C back to the bed and had forcible sexual intercourse with her. Defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of C in exchange for the dismissal of more serious charges.

With regard to the third encounter, S testified that, in the spring of 2007, defendant contacted her through her MySpace page. They had been slightly acquainted during high school but did not know each other well. S was a student at Oregon State University. Defendant told S that he would be attending a fraternity party there and he invited her to attend the party. S and defendant played drinking games along with other people attending the party, then defendant pulled S into a small room in the basement where they kissed. Defendant then reached under her skirt, which surprised her. They returned to the party and continued drinking, after which defendant pulled S out onto a sleeping porch. S was very intoxicated at that point. Defendant placed her on a bed, and she told him "no." Defendant gripped her hands so she could not move, then he lay down on top of her and had forcible sexual intercourse with her. S was treated at a hospital, but she did not report the attack to the police at that time. Again, defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of S in exchange for the dismissal of more serious charges.

With regard to the fourth encounter, R testified that, in the summer of 2006, when she was 18, she attended a party at the house of students at Western Oregon University in Monmouth, where R planned to attend school as a freshman in the fall. R was introduced to defendant at the party, and she played a drinking game with him and others. R was not an experienced drinker and soon became intoxicated. She went to the bathroom, and, as she came out, defendant was waiting for her. R wanted to find the friend with whom she had come to the party, and defendant offered to help find the friend. He led her into a nearby bedroom and shut the door. R told defendant that she needed to find her friend, and she

tried to leave the room, but defendant told her to "lie down and sober up." R lay down on the floor. Defendant then lay down next to her and kissed her. She consented to the kissing, but when he tried to go further, she told him "no" and struggled to stop him. He tore off her underwear and penetrated her vagina with his fingers, then attempted to penetrate her with his penis, but she struggled enough that he was unable to complete the rape. R's friend then came into the room, and defendant ceased the assault. R did not report the assault at the time, but she later came forward after she saw news of defendant's arrest on some of the other rape charges.

Finally, with regard to the fifth encounter, P testified that she had grown up in the same town as defendant and that they became friends—but not boyfriend and girlfriend—while in middle school. Defendant made arrangements to "hang out" with P and one of her friends after school one day when they were in the eighth grade. Defendant then contacted P and asked her not to bring her friend. Defendant and P played basketball and other games, then they went into defendant's bedroom to listen to music. Defendant began to tickle P, then brought out handcuffs and bound her to a bedpost while continuing to tickle her. P became concerned when defendant duct-taped her mouth shut and blindfolded her. Defendant proceeded to pull up P's shirt and bra, and pull down her pants. Defendant laughed and made fun of P as he was doing this. He then pulled out some of her pubic hair and inserted a telephone antenna into her vagina. Eventually, defendant released P and allowed her to use the bathroom, after which he asked her to perform oral sex. P refused and left defendant's house. P did not disclose the abuse at that time, but she disclosed it to a high school counselor four years later. P later made a pretext call to defendant on behalf of the police, in which he admitted some of the conduct. As a result, defendant was adjudicated within the juvenile system.

As noted, in this case the trial court held a pretrial hearing regarding the admissibility of the testimony of B, C, S, R, and P. The prosecutor asserted that the evidence was relevant, not to show whether sexual contact had occurred between defendant and the victim, but, rather, to show that

the victim had not consented to that contact. The court commented on the similarities among the various encounters, and further noted that, although the evidence had an "inflammatory aspect," the risk of unfair prejudice was mitigated because defendant had waived his right to a jury trial. The court concluded that, in any event, the probative value of the evidence outweighed any unfairly prejudicial effect and ruled that the evidence was admissible under OEC 404(3).

The case was tried to the court. Defendant's theory of defense at trial was that the victim had consented to sexual contact between them. Before announcing its verdict, the court noted that, although defendant had been charged with rape by "forcible compulsion," ORS 163.365(1)(a), defendant could have been convicted on another theory of first-degree rape on the same evidence, because the victim had been incapacitated under ORS 163.375(1)(d) (victim incapable of consent by reason of "mental incapacitation or physical helplessness").[1] At sentencing, the court noted that, although it had considered the evidence concerning the other sexual encounters, it was "primarily" the victim's testimony that had persuaded the court, and "that was what I focused on almost entirely." In sentencing defendant on the first-degree rape charge, the court imposed an upward departure from the mandatory minimum sentence of 100 months' imprisonment to the maximum departure sentence of 144 months, stating "there's one finding that I believe the court can make by substantial and compelling level of analysis, and that is, vulnerability of the victim."

On appeal, defendant challenges the court's admission of the testimony of B, C, S, R, and P under OEC 404(3). That rule provides that

"[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

---

[1] The court stated, "And the evidence clearly indicates to me or indicates beyond a reasonable doubt that [defendant] was fully aware of [the victim's] condition and her incapacity to consent." The court added that, because defendant was not charged under that subsection of the statute, "I cannot consider that as the basis of guilt in this case, even though the facts establish that."

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Defendant argues that the challenged evidence was not admissible to show that he intended to commit the charged offenses under the test set out in *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986).[2] In response, the state argues that the evidence was admissible to show that the victim did not consent to sexual contact with defendant.

Because the state proffered the challenged evidence to refute defendant's theory that the victim had consented to sexual contact, rather than to prove defendant's intent or absence of mistake, "the *Johns* analysis is inapplicable as a basis for determining the relevance of the evidence." *State v. Bracken*, 174 Or App 294, 300, 23 P3d 417, *rev den*, 333 Or 162 (2001). The governing test for the admission of uncharged misconduct evidence to prove lack of consent was set out by the Supreme Court in *State v. Johnson*, 340 Or 319, 131 P3d 173, *cert den*, 549 US 1079 (2006). In *Johnson*, the defendant was convicted of aggravated murder by strangulation of a teenaged girl, Fraser. The state adduced evidence that the defendant had been "hitting on" and providing drugs and alcohol to Fraser before her disappearance. *Id.* at 321. The state also adduced evidence that Fraser "had a significant amount of morphine in her system when she died and that her vaginal cavity contained semen whose DNA matched defendant's DNA." *Id.* at 322. The state's theory of the case was that the defendant had raped Fraser before

---

[2] *Johns* sets out the following test:

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?

"(6) If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

301 Or at 555-56.

murdering her. *Id.* at 338. In support of that theory, the state offered evidence from

> "young women who claimed that defendant had drugged them to the point of incapacitation with morphine or other substances. Some of those witnesses also claimed that defendant had taken advantage of them sexually while they were under the influence of the drugs that defendant had administered or supplied. The state argued that the testimony of those witnesses was relevant to prove several elements of its case against defendant—most notably, that defendant had raped Fraser before he murdered her. In that regard, we note that the state had strong direct evidence that defendant had had sexual intercourse with Fraser shortly before she died but had no way of proving directly that defendant's sexual contact with Fraser was nonconsensual. However, when combined with the toxicology report showing a significant level of opiates in Fraser's system, the testimony at issue would be powerful circumstantial evidence that defendant's sexual contact with Fraser occurred after he had drugged her, and that he took advantage of her incapacitated state. The inferences that the state wished to rely on would not include a general subjective assessment of defendant's character or involve any allegation that defendant had a propensity to commit rape. Instead, the evidence made the state's explanation of the facts (defendant's seminal fluid in Fraser's vaginal cavity and a high level of morphine in Fraser's body) more likely, and thereby made defendant's guilt both of rape in the first degree and sexual abuse in the first degree more likely."

*Id.* at 338-39 (footnote omitted).

The court then considered whether the evidence in question was sufficiently probative of the state's theory. It rejected the notion that prior case law concerning "signature crime" evidence or evidence offered to establish a defendant's intent was directly applicable to the issue of consent. *Id.* at 339-40. Rather, the court stated:

> "There is no requirement that the evidence of the uncharged crime demonstrate a *distinctive* methodology or 'signature' crime, as when such evidence is used to establish the identity of the perpetrator. However, it *is* essential that the uncharged crimes evidence involve a method of

incapacitation (administration of an intoxicating sub-stance) that would support the narrow inference that the state seeks to draw from it—that sexual contact between Fraser and defendant occurred while Fraser was incapaci-tated by morphine that defendant had administered. And, although there is no requirement that the uncharged crime closely replicate the crime that is charged (as there is when prior crime evidence is used to establish identity), any sim-ilarity in the circumstances increases the probative value of the prior crime evidence and enhances the argument for admissibility under OEC 404(3). Likewise, the timing of uncharged crimes *vis-à-vis* the charged crime and the num-ber of instances that are shown may affect the question of admissibility. No categorical rule exists, but timing, repe-tition, and similarity of both the act and the surrounding circumstances all are important considerations."

*Id.* at 340 (emphasis in original; footnote omitted). The court concluded that the challenged evidence was admissible "for the noncharacter purpose of showing that F did not consent and, in fact, was incapable of consenting to the sexual contact she had with defendant." *Id.* In particular, the court observed, most of the testimony concerned prior events where the defendant had administered morphine to women using various methods (although one instance involved inca-pacitation with alcohol), and four of the women testified that the defendant had sexually abused them in various ways while they were under the influence of morphine. *Id.* at 340-41, 340 n 14. The court concluded that the uncharged miscon-duct evidence gave rise to an inference that the defendant had, in fact, administered morphine to the victim and that the inference

"is strengthened by the multiplicity of similar incidents (suggesting a pattern), the fact that all the incidents occurred within the year preceding Fraser's murder, and the fact that the victims of those uncharged crimes all were teenage girls who moved in the same circles as Fraser."

*Id.* at 342.

In *State v. Momeni*, 234 Or App 193, 227 P3d 1230, *rev den*, 348 Or 523 (2010), we applied the template set out in *Johnson* in a case involving sexual abuse. There, the defen-dant was the victim's landlord, and the victim had gone to his

office to discuss the fact that her rent was overdue. *Id.* at 195. The defendant locked the office door behind the victim, and then proceeded to touch the victim sexually without her consent. *Id.* Afterwards, he told the victim not to worry about the rent. *Id.* The defendant acknowledged the sexual contact, but he contended that the victim had initiated it to induce him to treat her favorably in regard to the unpaid rent. *Id.* at 196. To refute the defendant's theory, the state offered evidence from two other tenants in the apartment complex that they had approached the defendant concerning tenancy issues and also had been subjected to unwanted sexual contacts. *Id.* at 196-97. Relying on the factors elaborated in *Johnson*, we noted the similarities between the charged and uncharged conduct—that the victims were all young women, that the contacts all occurred at the same apartment complex in the same general time period, and that the victims had been alone and had sought help from the defendant. *Id.* at 199-200. We held that the evidence was relevant for a noncharacter purpose and that it "demonstrate[d] defendant's method of manipulating his landlord-tenant relationship with other female tenants to place them in circumstances where they were vulnerable to his sexual advances." *Id.* at 200. We concluded that, as in *Johnson*, the evidence allowed the jury to draw an inference "that the victim, like other victims, had not consented to the sexual contact with the defendant." *Id.*

In *State v. Leistiko*, 240 Or App 338, 340, 246 P3d 82 (2011), the defendant was charged with the forcible rape of three different women whom he had contacted based on their Internet advertisements in the "erotic services" section on a particular website. The defendant objected to uncharged misconduct evidence that, at his request, the women had come to his apartment to perform services that did not include sexual intercourse and that the defendant had "forcibly raped those victims at his residence after they declined his requests for consensual sexual intercourse." *Id.* The state also proffered evidence that the defendant had contacted a fourth woman, who advertised massage services through the "erotic services" section on the same website, that he had gone to her home, and, when she refused to perform consensual sexual services, that the defendant had forcibly raped her. *Id.* at

340-41. In concluding that "the challenged evidence was admissible to support the victims' credibility and to rebut defendant's claim that the victims had consented," *id.* at 345, we followed the reasoning of *Johnson* and *Momeni.* We noted that all of the incidents had occurred within the same year and that they showed a method of using the Internet "to contact women and arrange meetings with them in private for intimate activities that resulted in nonconsensual sexual activity." *Id.*

■ In light of *Johnson, Momeni,* and *Leistiko,* we readily conclude that the testimony of B, C, S, and R was properly admitted in this case under OEC 404(3). In each of those incidents, as in the charged incident, defendant approached a young female acquaintance and either enticed her to a place where alcohol was being consumed or approached a young female acquaintance who was already present at a setting where alcohol was being consumed. In most of those instances, defendant plied the victim with alcohol; in all instances, he was in a position to perceive that the victims were incapacitated due to alcohol consumption. In each instance, defendant made efforts to isolate the victim from her peers, either by arranging to meet her alone or by taking her to an area where others were not present. In each instance, the victim verbally objected to defendant's sexual advances and, in the instances where the victims were not unconscious due to alcohol intoxication, each attempted to physically resist defendant's advances. And, in each instance, defendant ignored the victim's protests and proceeded with rape or attempted rape. All of those four incidents occurred within a 14-month period, and all occurred in or around college settings. In addition, all involved victims whose judgment and physical ability to resist unwanted sexual advances were significantly impaired by alcohol. In sum, in each of those four incidents, the "timing, repetition, and similarity of both the act and the surrounding circumstances" were notable. *Johnson,* 340 Or at 340. Accordingly, we conclude that the trial court did not err in admitting, pursuant to OEC 404(3), the testimony of B, C, S, and R.

■ The admissibility of P's testimony presents a closer question. As defendant points out, the incident involving P occurred approximately seven years earlier than the charged

incident, and it did not involve the consumption of alcohol. Moreover, the crimes perpetrated against P did not involve rape or attempted rape but, rather, involved various other forms of sexual and physical abuse. Moreover, the crimes committed against P involved incapacitating her by means of bondage equipment rather than alcohol. If evidence of the incident involving P had been the only uncharged misconduct evidence offered in this case, we might conclude that, in light of its remoteness in time from the charged conduct, as well as the other differences described above, the permissible inferences available from that evidence were too weak to support its admission. However, viewing that evidence in light of the other OEC 404(3) evidence that was properly admitted, its logical relevance in this case becomes more apparent.

First, in the incident involving P, as was the case with the charged conduct and the incidents involving the other victims, defendant isolated his target from her peers. In the case of P, defendant asked her not to bring their friend when meeting him. Here, defendant told the victim that he wanted to see her outside the presence of her roommate, who had introduced them. In the case of R, defendant, under the pretext of helping her find her friend, took her into a bedroom, and then prevented her from leaving the room to locate the friend. Thus, evidence that defendant isolated P from her friend takes on particular significance in light of the other evidence.

Second, with P, as with several of the other victims, defendant used subterfuge in rendering the victim helpless. Defendant handcuffed P in the context of playing a tickling game with her. With several of the other victims, defendant played drinking games before assaulting them. In the present case, defendant attempted to have sexual contact with the victim in the context of a card game, insisting that she must kiss him if she lost the game.

All in all, we conclude that the evidence concerning defendant's abuse of P was logically relevant to refute defendant's theory that the victim in this case consented to sexual contact with defendant. Further, to the extent that concerns might exist about possible misuse of the evidence, the trial court indicated that, in reaching its verdict on the rape

charge, it had focused "almost entirely" on the testimony of the victim as to what had happened between her and defendant and less on the evidence concerning "victims of other incidents." In sum, we conclude that the court properly admitted evidence of defendant's assaults on B, C, S, R, and P under OEC 404(3).

■ We turn to defendant's arguments concerning his sentence. Defendant argues that, when the trial court imposed an upward departure sentence "by substantial and compelling level of analysis," the court impermissibly used a lesser standard of proof than proof "beyond a reasonable doubt," as required by *Apprendi v. New Jersey*, 530 US 466, 490, 120 S Ct 2348, 147 L Ed 2d 435 (2000). We disagree that the court's statement can be read to indicate that it applied a lesser standard of proof than what is constitutionally required. The phrase "substantial and compelling," in Oregon sentencing parlance, does not refer to a burden of proof, but to "substantial and compelling *reasons* to impose a departure." OAR 213-008-0001 (emphasis added). Our understanding that the court was not confused in that regard is supported by the fact that the court (which had been the trier of fact at trial as well as at sentencing) used the "vulnerable victim" departure factor and had previously indicated on the record that, if the crime had been charged in that manner, it would have found—beyond a reasonable doubt—that the victim was incapable of consent due to her incapacitation caused by alcohol consumption. 242 Or App at 379 n 1.

■ Finally, defendant argues that the sentencing court erred in imposing a compensatory fine of $3,000 payable to the victim, in the absence of any evidence of pecuniary damages. The state concedes that the record does not support the award. We agree and accept the concession. *See, e.g., State v. Snyder*, 220 Or App 440, 441, 186 P3d 324 (2008) (concluding that court erred in imposing compensatory fine in the absence of evidence of economic damage).

Remanded for resentencing; otherwise affirmed.