Submitted on remand from the Supreme Court March 11, affirmed
July 31, 2013

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON EDWARD KLONTZ,
*Defendant-Appellant.*

Marion County Circuit Court
08C40935; A141178

308 P3d 214

Peter Gartlan, Chief Defender, and Marc D. Brown, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Rene C. Holmes, Senior Assistant Attorney General, filed the opening brief for respondent. Mary H. Williams, Deputy Attorney General, Anna M.

Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the supplemental brief.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Egan, Judge.

HASELTON, C. J.

## HASELTON, C. J.

This case is before us on remand from the Oregon Supreme Court for reconsideration in light of *State v. Leistiko*, 352 Or 172, 282 P3d 857, *modified on recons*, 352 Or 622, 292 P3d 522 (2012). *State v. Klontz*, 353 Or 208, 297 P3d 480 (2013). In our prior decision, *State v. Klontz*, 242 Or App 372, 256 P3d 138 (2011) (*Klontz I*), we concluded that the trial court properly admitted under OEC 404(3)[1] evidence of prior sexual offenses committed by the defendant in order "'to rebut defendant's claim that the victim[ ] had consented'" to sexual contact. *Klontz I*, 242 Or at 384 (quoting *State v. Leistiko*, 240 Or App 338, 345, 246 P3d 82 (2011)). As explained below, we conclude that even assuming, without deciding, that the trial court erred in admitting the disputed evidence, any error had little likelihood of affecting the verdict. Accordingly, we affirm defendant's convictions.

We take the facts from our recitation in *Klontz I*. The evidence of the charged offenses of first-degree rape and furnishing alcohol to a minor were as follows:

"The victim, F, who was 18 years old, was introduced by her roommate to defendant, who at that time was a student at Corban University in Salem. In the spring of 2007, defendant contacted the victim through her MySpace page, indicating that he wanted to 'hang out' with her. The victim initially indicated that they might see each other again when he saw her roommate. Defendant's responses indicated that he wanted to see the victim without the roommate being present. After a number of e-mail and text message exchanges, they agreed to go to a movie. The victim picked up defendant at Corban University and drove to the theater. Before they entered the theater, defendant indicated to the victim that he had brought alcohol to consume in the theater, and he proceeded to mix juice with liquor, which he put into water bottles and brought into the theater. During the movie, defendant encouraged the victim to drink and, when

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

she finished her first bottle, he left briefly to obtain more alcohol for her.

"By the time they left the theater, the victim was intoxicated. She realized that she should not drive and asked defendant to drive her home, telling him that he could take her car afterwards to drive himself back to the college. Instead of driving the victim home, defendant drove her to the college and took her to his dorm room. Because of her level of intoxication, the victim did not remember the ride to the college or going to defendant's dorm room. While in defendant's dorm room, defendant suggested that they play cards and that, if the victim lost the game, she should kiss defendant. The victim told him, 'no,' but he lifted her up by her shoulders and kissed her. The victim told him 'don't even try it' and 'don't do it again.' The victim then lost consciousness, and she woke up to find that the volume of the music had been turned up very loud, that she was on defendant's bed and that defendant was on top of her, having sexual intercourse with her. She struggled, but her shoulders were pinned to the bed and her hands were crossed over her chest, so she was unable to break free. She told defendant 'no,' but he did not stop.

"When defendant finished, he threw the victim's pants at her, escorted her down the stairs, set her down outside of the dormitory, and left. The victim eventually found her car and attempted to drive away, but soon realized that she was too intoxicated to drive and had friends come to pick her up. When the victim returned home, her roommate questioned her about whether she had been raped. She replied that she had, and her roommate called the police."

*Klontz I*, 242 Or App at 374-75.

Defendant was charged with rape by forcible compulsion, and the theory of his defense was that the victim had consented to sexual intercourse. To rebut defendant's theory that the victim consented, the state offered evidence of five prior incidents of forcible sexual encounters that defendant had had with different victims.[2] Because the admissibility of

---

[2] Four of the prior incidents had resulted in criminal convictions, and one had resulted in a juvenile adjudication. No issue is raised in this case as to whether the prior incidents actually occurred. *See State v. Johns*, 301 Or 535, 557-58, 725 P2d 312 (1986) (in evaluating admissibility of prior bad acts evidence offered to prove intent under the "doctrine of chances," court must assess the strength of the evidence that the defendant had committed the prior act).

that "prior acts" evidence remains the focus of our consideration on remand, we necessarily reiterate the details of each of those five prior incidents, as set forth in *Klontz I*:

"With regard to the first encounter, B testified that, in the fall of 2007, she travelled with a friend to Corvallis to attend a party at defendant's house. When she arrived, defendant invited her to help herself to alcohol; defendant then left to obtain more alcohol. B drank a significant amount of alcohol during the ensuing hour and became very intoxicated. She passed out on a couch, awoke to find defendant leading her upstairs to his room, and then blacked out again. She regained consciousness briefly to find herself in defendant's bed, lost consciousness again and, when she regained consciousness, defendant was having sexual intercourse with her. She passed out again, then awoke to find another girl, C, tending to her, telling her that she was very sick, and trying to keep her from passing out again. B heard defendant telling C to 'take care of her.' B lost consciousness again, then regained consciousness to discover that defendant was touching her vagina and that C was still present and was telling defendant, 'I can't do this' or 'I won't do this.' B heard defendant and C engage in what sounded like a sexual encounter in the closet of the room. B then found her clothes and returned to the living room of the house, where she remained visibly upset until her friend was located, after which the friend drove her home. Defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of B in exchange for the dismissal of more serious charges.

"With regard to the second encounter, C, the girl who had attempted to assist B as described above, testified that she had been drinking at the party and was intoxicated. At one point, she went to the bathroom and, as she was returning, heard B crying and hyperventilating in defendant's room. She had not known B before that evening. C was concerned that B was suffering from alcohol poisoning, so C went downstairs to find defendant. They returned to defendant's room, where B was still present, and defendant began kissing C. C attempted to push him off and said 'no.' Defendant pushed C into a closet, where she fell down, and defendant removed her pants while she continued to say 'no.' She explained that her initial objection was to defendant kissing her in B's presence. She further explained that she objected when defendant removed her pants and that

she did not want to consent to 'anything below the waist,' because she was a virgin. Defendant replied that he did not care. B had left the room while defendant and C were in the closet. Defendant brought C back to the bed and had forcible sexual intercourse with her. Defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of C in exchange for the dismissal of more serious charges.

"With regard to the third encounter, S testified that, in the spring of 2007, defendant contacted her through her MySpace page. They had been slightly acquainted during high school but did not know each other well. S was a student at Oregon State University. Defendant told S that he would be attending a fraternity party there and he invited her to attend the party. S and defendant played drinking games along with other people attending the party, then defendant pulled S into a small room in the basement where they kissed. Defendant then reached under her skirt, which surprised her. They returned to the party and continued drinking, after which defendant pulled S out onto a sleeping porch. S was very intoxicated at that point. Defendant placed her on a bed, and she told him 'no.' Defendant gripped her hands so she could not move, then he lay down on top of her and had forcible sexual intercourse with her. S was treated at a hospital, but she did not report the attack to the police at that time. Again, defendant ultimately entered into a plea agreement that resulted in a conviction for attempted rape of S in exchange for the dismissal of more serious charges.

"With regard to the fourth encounter, R testified that, in the summer of 2006, when she was 18, she attended a party at the house of students at Western Oregon University in Monmouth, where R planned to attend school as a freshman in the fall. R was introduced to defendant at the party, and she played a drinking game with him and others. R was not an experienced drinker and soon became intoxicated. She went to the bathroom, and, as she came out, defendant was waiting for her. R wanted to find the friend with whom she had come to the party, and defendant offered to help find the friend. He led her into a nearby bedroom and shut the door. R told defendant that she needed to find her friend, and she tried to leave the room, but defendant told her to 'lie down and sober up.' R lay down on the floor. Defendant then lay down next to her and kissed her. She consented to

the kissing, but when he tried to go further, she told him 'no' and struggled to stop him. He tore off her underwear and penetrated her vagina with his fingers, then attempted to penetrate her with his penis, but she struggled enough that he was unable to complete the rape. R's friend then came into the room, and defendant ceased the assault. R did not report the assault at the time, but she later came forward after she saw news of defendant's arrest on some of the other rape charges.

"Finally, with regard to the fifth encounter, P testified that she had grown up in the same town as defendant and that they became friends—but not boyfriend and girlfriend—while in middle school. Defendant made arrangements to 'hang out' with P and one of her friends after school one day when they were in the eighth grade. Defendant then contacted P and asked her not to bring her friend. Defendant and P played basketball and other games, then they went into defendant's bedroom to listen to music. Defendant began to tickle P, then brought out handcuffs and bound her to a bedpost while continuing to tickle her. P became concerned when defendant duct-taped her mouth shut and blindfolded her. Defendant proceeded to pull up P's shirt and bra, and pull down her pants. Defendant laughed and made fun of P as he was doing this. He then pulled out some of her pubic hair and inserted a telephone antenna into her vagina. Eventually, defendant released P and allowed her to use the bathroom, after which he asked her to perform oral sex. P refused and left defendant's house. P did not disclose the abuse at that time, but she disclosed it to a high school counselor four years later. P later made a pretext call to defendant on behalf of the police, in which he admitted some of the conduct. As a result, defendant was adjudicated within the juvenile system."

*Id.* at 376-78.

As noted in our initial consideration of this appeal, we held that the evidence of those prior incidents was admissible as relevant to whether the complainant in this case had (as defendant asserted) consented to intercourse. *Id.* at 385. In so holding, we relied on *State v. Johnson*, 340 Or 319, 131 P3d 173, *cert den*, 549 US 1079 (2006), as well as our own recent decisions in *State v. Momeni*, 234 Or App 193, 227 P3d 1230, *rev den*, 348 Or 523 (2010), and *Leistiko*.

In *Johnson*, as pertinent to our analysis, the Supreme Court had sustained the admission of evidence that the defendant, who was charged with aggravated murder in the course of rape that had involved drugging the victim, had previously drugged young women to the point of intoxication and then had sexual contact with them. 340 Or at 338-39. There was physical evidence that the defendant had had intercourse with the victim and that the victim had been drugged before her death. There was not, however, direct evidence that the "defendant's sexual contact with [the victim] was nonconsensual." *Id.* at 339 (footnote omitted). The Supreme Court in *Johnson* concluded that the prior bad acts evidence was "admissible for the noncharacter purpose of showing that [the victim] did not consent and, in fact, was incapable of consenting to the sexual contact." *Id.* at 340.

Shortly thereafter, in *Momeni*, we applied *Johnson*. There, the defendant had raised a defense that the alleged sexual contact between him and the victim, a tenant at his apartment complex, had been consensual, and the state, to counter that defense, introduced evidence that the defendant had had nonconsensual sexual contacts with two other tenants. 234 Or App at 195-97. The admissibility of that evidence was the focus of the appeal, and, relying on *Johnson*, we concluded that the evidence was admissible "because it has the tendency to make [the victim's] testimony more credible and to refute defendant's claim that she consented to his actions." *Id.* at 200.

Finally, in *Klontz I*, we relied on our own (subsequently reversed) decision in *Leistiko*. There, we concluded that evidence of prior sexual contact between the defendant and women whom he had sexually abused under similar circumstances was relevant to "counter[ ] a defense theory that the named victims consented to having sexual activity with defendant." *Leistiko*, 240 Or App at 345.

In sum, our analysis and holding in *Klontz I* was predicated on precedent holding that evidence that others had previously had nonconsensual sexual contacts with a defendant was directly pertinent to whether the victim of the charged offense had consented to sexual contact. The Supreme Court's decision in *Leistiko*—the catalyst for this

remand—illuminated and, in some fundamental respects, transformed that landscape.

In *Leistiko*, the Supreme Court retreated from the broad language in *Johnson* that supported that theory of admissibility. The court acknowledged its broad statement in *Johnson* that the evidence at issue there "'permitted the jury to infer that the victim, like others, had not consented,'" 352 Or at 181 (quoting *Johnson*, 340 Or at 341), but went on to say:

> "The fact * * * that one woman consented (or refused to consent) to have sexual relations with defendant does not mean that another woman made the same choice. *See Lovely v. United States*, 169 F2d 386, 390 (4th Cir 1948) ('The fact that one woman was raped * * * has no tendency to prove that another woman did not consent.'). In that context, there are too many independent variables for one victim's state of mind to be relevant to prove another's."

*Leistiko*, 352 Or at 181 (second omission in *Leistiko*).

Given that understanding, the Supreme Court in *Leistiko* proceeded to explore possible alternative theories of relevance for the evidence at issue in *Johnson*. First, the court indicated that any inference that the trier of fact could properly draw from that "past act" evidence did not concern the *victim's* state of mind as to consent—but, instead, related either to the *defendant's* state of mind or to whether "the defendant had a plan or method for obtaining sexual access to women while they were incapacitated and acted pursuant to that plan with the victim in that case." *Id.* (citing *Johnson*, 340 Or at 341-42).

The Supreme Court went on to address the construct governing the admissibility of such evidence either as proof of "intent" or as proof of "plan." The court began by reiterating and elucidating the legal analysis of *State v. Johns*, 301 Or 535, 725 P2d 312 (1986).[3] The court in *Leistiko* particularly noted the "doctrine of chances" theoretical underpinnings of

---

[3] The court in *Johns* set forth the following test for determining the relevance of prior bad acts evidence to prove intent, which will be discussed more fully below:

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

*Johns. Leistiko*, 352 Or at 182-83. In *Johns*, the defendant, who was charged with killing his wife, advanced a theory that he had shot her accidentally, and the state—to prove lack of accident or mistake—offered evidence that the defendant previously had attempted to shoot his former wife. 301 Or at 540-41. The *Leistiko* court noted:

"The defendant in *Johns* did not dispute that both acts had occurred [*viz.*, that the defendant had attempted to shoot his former wife and had, in fact, shot and killed the victim]. Only the defendant's mental state in committing those acts was at issue. That aspect of *Johns* reflects what Wigmore has described as a 'peculiar feature' of the doctrine of chances. *See* John Henry Wigmore, 2 *Evidence* § 302, 245 (Chadbourne rev 1979). Wigmore explained:

"'It will be seen that the peculiar feature of this process of proof [the doctrine of chances] is that the *act itself is assumed to be done,*—either because (as usually) it is conceded, or because the jury are instructed not to consider the evidence from this point of view until they find the act to have been done and are proceeding to determine the intent.'

"Wigmore reasoned that, when the question is not whether a defendant committed the act but is instead only whether the defendant acted with an innocent state of mind, the proponent of uncharged misconduct evidence need only show that the uncharged and charged conduct were similar. *Id.* § 302 at 245. Conversely, '[w]hen the very doing of the act charged is still to be proved,' Wigmore reasoned that a party can introduce evidence of a defendant's plan to do the act to prove that the defendant acted pursuant to the plan. *Id.* § 304 at 249-52. However, something more than prior similar acts is required to establish a plan."

352 Or at 183-84 (some citations omitted; footnotes omitted; emphasis in Wigmore).

---

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?"

301 Or at 555-56.

Thus, the Supreme Court in *Leistiko* highlighted differences between the "intent" theory of admissibility and the "plan" theory. That is, if the evidence in question is being offered to prove that the defendant acted with a certain intent (and included in that category is "absence of mistake or accident as the equivalent of intent," *id.* at 184 n 9), it becomes relevant only at the point that the *actus reus* itself is not at issue—that is, in situations where the act is conceded or the factfinder has found that the defendant committed the operative act, and the dispute has been reduced to whether the defendant, in committing that act, acted with the requisite culpable mental state. Conversely, the trier of fact may consider "prior acts" evidence in determining whether the defendant had a "plan" to commit the charged crime— and that, in turn, may be used in establishing whether the *actus reus* occurred. That is, unlike with proof of mental state—where establishment of the *actus reus* must *precede* consideration of such evidence—when prior acts evidence pertains to "plan," that evidence itself can substantiate whether the *actus reus* occurred.

The Supreme Court then proceeded to apply those foundational principles to the particulars of *Leistiko*. The court first concluded that the disputed evidence could not be offered under *Johns* to prove the defendant's intent because the defendant had not conceded that the *actus reus* had occurred, and, in the absence of such a concession, the jury had not been instructed to consider the disputed evidence only after determining that the *actus reus* had occurred. *Leistiko*, 352 Or at 185. The court further noted that, although the "doctrine of chances" theory is potentially applicable where there is a single prior bad act, that is so only if that act is a sufficiently "complex act requiring several steps, particularly premeditated." *Id.* at 186. In *Leistiko* itself, however, the disputed evidence, which involved a single prior instance of nonconsensual sexual intercourse, did not involve a "complex factual scenario." *Id.*

The Supreme Court then turned to the theory that the disputed evidence was relevant to demonstrate "plan" or "method." The court acknowledged that language in its prior *Johnson* opinion offered some support for that theory. *Id.* at

187. After noting some disagreement among scholars about whether prior bad acts evidence introduced to demonstrate "plan" must be so similar as to constitute *modus operandi* or "signature crime" evidence,[4] or some lesser degree of similarity, the court declined to resolve the precise degree of similarity required to establish the admissibility of "plan" evidence. *Id.* at 189. That was so because, in any event, the prior bad act at issue in *Leistiko* was not sufficiently similar to be admissible even to prove intent, and therefore "[i]t necessarily follows that [it] also was not sufficiently similar for it to be admissible to prove a plan." *Id.* In sum, the *Leistiko* court indicated that prior bad acts evidence offered to prove "plan" must *at least* meet the similarity criteria set forth in *Johns*—and might require an even higher degree of similarity.

Thus, *Leistiko*. With its instruction in mind, we return to the present case.

Before trial, the state, citing OEC 404(3) and *Johns*, moved *in limine* to admit the evidence of the five prior incidents described above.[5] *See* 257 Or App at 687-90. Because the circumstances of the trial court's consideration, and ultimate admission, of the "prior acts" evidence circumscribe our review and disposition, we recount those circumstances in some detail.

The state asserted for purposes of the *in limine* motion that the "prior acts" evidence was relevant to "defendant's intent, knowledge and absence of mistake." It set forth the test from *Johns* and argued that, in the present case, it had

"charged that defendant knowingly forcibly raped the victim. The defendant maintained to the police that the sex was consensual, while the victim is adamant that it was not. The proof of the state of mind of the defendant is not only required, but is the major issue in the case."

---

[4] *See State v. Johnson*, 313 Or 189, 196, 832 P2d 443 (1992) (prior bad acts evidence offered to prove the identity of the perpetrator by *modus operandi* requires "a very high degree of similarity between the charged and uncharged crimes," and a distinct methodology "so as to earmark the acts as the handiwork of the accused").

[5] The motion actually pertained to potential evidence from nine prior victims, but only five of those victims testified at defendant's trial.

In response, defense counsel focused on whether the factors set forth in *Johns* had been met.

At the pretrial hearing, the state argued that it intended

"to prove that [defendant's] intent was forcible rape, that this was a plan, premeditated, forcible date rape. *** *He said it was consensual. She said it was forcible.*

"So we're required—in order to prove his intent and his lack of mistake, we're required to prove intent."

(Emphasis added.) The court summarized the state's position as follows:

*"In this case the only thing that's really in issue is consent, and the state's claiming that consent was either, you know, avoided or—or it was the intent or plan* that I'm going to—I know this woman, I'm going to invite her out on a date and, you know, I—whether the whole stream from start to finish was intentional, but I have an acquaintance. I invite her on a date. We have some fun. I take her to a party. We get intoxicated. There are people around. Then I take her some place where there aren't people around and I have sex with her. I mean those are the similarities that the state is looking at."

(Emphasis added.) The court then went through a list of questions it had created based on the *Johns* factors, and enumerated the similarities and dissimilarities between the charged offense and the prior incidents. The court concluded:

"[I]n this case I find that the *evidence intended to be offered is both relevant and probative*, and that the evidence increases the probability of existence of a material fact in issue, *i.e.*, *whether the acts were consensual* as opposed to criminal and nonconsensual.

*"I find the prior acts intended to be relied upon are consistent in manner, method, carrying out circumstances and modus*, and that they cannot be deemed to be merely coincidences that are implausible, unusual and objectable [*sic*] and improbable, *such that the defendant is accused in each case of nonconsensual acts while contending they were in each and every instance consensual.*

"The nature and facts of each of those prior acts is compelling evidence of the necessary mens rea of this case. ***

"The state's got to prove that the defendant's conduct constituted knowing forcible rape. *The defendant here contends that the acts occurred but that they were, in all instances, consensual in nature, and this is the major issue in this case and the reason these prior acts become relevant.*

"The answer might be different, for example, if the defendant contended here that this act just did not happen or that it was not him or that—and that he was not there, but that's not the case, so *then they do become relevant, and frankly, primarily because of the defendant's own contention in this case.*"

(Emphases added.)

The case then proceeded to a bench trial, before a different judge, and the prosecutor made the following statements:

"Your Honor knows, that date rapes are—usually there's only two people around when they happen, so there's going to be testimony of—by victims in other similar cases and—as you know as well, Your Honor. But the long and short of it is the state is going to provide evidence to show that [defendant] is a calculated and premeditated date rapist; that *he's done this same sort of actions, the same plan and scheme* that he uses; just insert a different girl's name, a different unknowing victim into his plan, and you've got the same *exact schemata every time.*"

(Emphases added.) In closing argument, the prosecutor stated:

"I would argue to Your Honor, you could take the four victims that testified—as you know, through our *Johns* motion we were able to have the four out-of-county girls testify with regards to the defendant's intent or state of mind during the sexual act at issue. I would say you could cut those off the table and the case still has merit and is still strong, despite being a date-rape case, which are inherently tough to prove and inherently, you know—it's one person's word against another, that's the nature of the case."

The court then indicated that it would take the matter under advisement, stating:

"I need to focus, I think—and [defense counsel] has correctly narrowed it down, in my mind the issue is forcible

compulsion. And I want to look at my notes in terms of evidence of physical resistance, I want to look at my notes in terms of what was said at different times. I look at this as a situation where the evidence indicates that the victim was certainly incapable of consenting, but forcible compulsion may require more than that the way this is alleged."

The court subsequently rendered its verdict:

"I think as I indicated when I took the matter under advisement, the evidence leaves me with no doubt that [the victim] was incapable of consent by reason both of her mental incapacitation and physical helplessness due to her drinking. And I'm applying the terms—I won't go through them, but even the terms 'mental incapacitation' and 'physical helplessness' are defined under the statute in ORS 163.305(4) and (5). And the evidence clearly indicates to me or indicates beyond a reasonable doubt that [defendant] was fully aware of [the victim's] condition and her incapacity to consent. That section, which is the fourth prong of the rape in the first degree statute, is not alleged by the state and I cannot consider that as the basis of guilt in this case, even though the facts establish that.

"The issue remaining for the court's consideration, therefore, and what I've done—considering and looking at in terms of reviewing the statute and the evidence, is the fourth element: Does the evidence establish that [the victim] was subjected to forcible compulsion? And under ORS 163.305(2)(a) and (b), 'forcible compulsion' is defined for me to mean—it means to compel either by physical force or by threat, express or implied, that places the victim in fear of imminent or future death, physical injury, or kidnap. So there are two ways there can be forcible compulsion. The threat aspect of that definition is not supported by the evidence in this case. * * *

"So I'm narrowing it down to a finding and a decision on whether there was forcible compulsion. All that's left for me, the way this is alleged and the—the way it's charged, is by forcible compulsion, by physical force. Therefore, I must find that [defendant] used physical force to compel intercourse if I'm to find him guilty of rape in the first degree.

"There is evidence of physical force in this case. In arriving at a decision as to whether or not the evidence is

sufficientto prove that last element, I've taken into account [the victim's] physical and cognitive impairment in terms of her ability—how much force is necessary, how much force— physical force, would be necessary to compel sexual intercourse. I've also taken into account her physical and—well, primarily her cognitive impairment in terms of how much weight I can put on her testimony. * * *

"There's evidence in this case that shows physical force. The incident prior to intercourse is described as [defendant], who is a considerably larger person than [the victim], basically raising her up by the shoulders, an attempt to kiss her. There's absolutely no doubt in my mind that [the victim] made it clear she did not want to have sex; she did not want to be kissed, she did not want to have sex. When she came to consciousness on the bed, she indicated that was kind of an acute consciousness, kind of—she described it as being shocked into awareness. Her shoulders were pinned back. Her arms were pinned across her chest. She testified that she tried to move around and was unable to do that; that she was struggling, that she was trying to move. Because of his size and weight, she was unable to do so. And when she—and as I've gone through and looked at my notes carefully, that when she struggled, he didn't stop."

The court, thus, concluded that defendant was guilty of first-degree rape by forcible compulsion. At no point in explaining its deliberate process and verdict did the trial court refer to the "prior acts" evidence for any purpose.

At sentencing, the state sought an upward departure sentence, arguing that four aggravating factors were present: vulnerability of the victim, persistent involvement in similar offenses, lack of remorse, and demonstrated disregard for the law. The court noted that, although there had been testimony "from other victims of other incidents," it had primarily focused on the victim's testimony, and the court stated: "[I] gave my verdict on the facts of [this] case, between [defendant] and [the victim], and that was what I focused on almost entirely." With respect to the departure factors, the court stated, "there's one finding that I believe the court can make by substantial and compelling level of analysis, and that is, vulnerability of the victim. * * * The other factors I will not find at this time."

To summarize: At the pretrial hearing, the state took the position that the disputed "prior acts" evidence was relevant to prove "plan" and "intent" and to refute defendant's assertion that the victim had consented, rendering the intercourse nonforcible. In proffering the evidence, and without differentiation among those putative bases of admissibility, the state asserted that the evidence of the acts, individually and collectively, satisfied *Johns*'s requisites.

The trial court's ruling (quoted above) on the *in limine* motion, *see* 257 Or App at 695-97, was, with respect, somewhat amorphous. Although the court referred, variously, to concepts of "plan" (*e.g.*, "the prior acts intended to be relied upon are consistent in manner, method, carrying out circumstances and modus") and intent (*e.g.*, "evidence of the necessary *mens rea*"), its predominant and pervasive theme was that the evidence was probative of "consent" or the lack thereof (*e.g.*, "[t]he only thing that's really in issue is consent"; "[t]he evidence increases the probability of * * * whether the acts were consensual as opposed to criminal and nonconsensual").

In the parties' initial (pre-remand) briefing of this appeal, defendant contended that the trial court had erred in admitting the disputed evidence as evidence of defendant's intent and, in so asserting, argued at length that the prior acts, individually and collectively, did not satisfy *Johns*'s requisites. The state remonstrated that, regardless of whether the disputed evidence was properly admitted under the *Johns* formulation as relevant to defendant's intent, "it was relevant to prove that defendant had sexual intercourse with the victim *without her consent*." (Emphasis in original.) In so contending, the state made *no* effort to defend the admissibility of the evidence as comporting with *Johns*'s requisites; instead, the state, invoking *Johnson* and *Momeni*, argued solely that "the evidence concerning defendant's other victims permitted the trier of fact to properly infer that [the victim] did not consent to sexual intercourse."

As noted, 257 Or App at 690 held that the disputed evidence was admissible as "logically relevant to refute defendant's theory that the victim in this case consented to sexual contact with defendant." *Klontz I*, 242 Or App at

385. As also noted, that holding was predicated on *Johnson*, as well as our decisions in *Momeni* and *Leistiko*. *Id*. at 380-84. Finally, as noted, the Supreme Court in *Leistiko* disavowed some aspects of *Johnson* (*viz*., any application of evidence that victims of a defendant's prior sexual conduct had not consented to that conduct was relevant, by way of some obverse propensity, to refute a claim that the present complainant had consented to the charged conduct) and deconstructed and called into question, albeit without resolution, others (*e.g.*, the proper construct for the admissibility of evidence of "plan"). *See Leistiko*, 352 Or at 189 ("In this case, we need not decide whether Imwinkelreid or Wigmore has the better of the argument [regarding whether the operative construct for 'plan' evidence is congruent with that required to establish *modus operandi* to prove intent].").

The effect of *Leistiko* on our consideration on remand is uncertain. That is so both because of the less-than-precise contours of the trial court's *in limine* ruling and because of our own rationale in *Klontz I* in sustaining that ruling. If the trial court had admitted the evidence on the stark "victim propensity" rationale disavowed in *Leistiko*—that is, that the nonconsent of past victims was probative of the present complainant's (non)consent—and, if we had endorsed such reasoning, the error would be manifest. But that is not what transpired. Rather, at least arguably in the trial court and certainly in our opinion in *Klontz I*, the basis of admissibility was that defendant's conduct manifested such a *Johnson*-like "plan" that the existence of such a "plan" to facilitate and perpetuate forcible sexual assaults was itself relevant to refute the asserted defense of consent. *See Klontz I*, 242 Or App at 384-86. That, in turn, implicates the dispute between Imwinkelreid and Wigmore, whose resolution the Supreme Court deferred in *Leistiko*. That is, did defendant's conduct with respect to some or all of the five prior incidents satisfy the requisites (whatever they may properly be) of admissibility as evidence of "plan"? We conclude on remand that we, like the Supreme Court in *Leistiko*, need not resolve that question. That is so because, in the particular—perhaps even idiosyncratic—circumstances of this case in which the trial court, following a bench trial, rendered a comprehensive "speaking verdict" of the bases of

its disposition, any error in the admission of the challenged evidence was harmless.

"Evidential error is not presumed to be prejudicial." OEC 103(1). Rather, such error is reversible error only if "a substantial right of [a] party is affected." *Id*. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (evidentiary error is harmless where there is "little likelihood that the error affected the [trier of fact's] verdict").

The trial court's comments, and particularly its "speaking verdict" in this case, manifest its thought process in rendering its disposition. As noted, the court discussed at length the evidence concerning consent and forcible compulsion, *see* 257 Or App at 698-99—and did so without *any* reference to the "prior acts" evidence. The keystone of the court's consideration was explicit: "There is absolutely no doubt in my mind that [the victim] made it clear she did not want to have sex. * * * [W]hen she struggled, he didn't stop." That finding was, in turn, expressly predicated on the court's assessment of the credibility of the details of the victim's account *by its own terms*, without reference to any purported "plan" by defendant or any other aspect of defendant's history. *See id.*

We fully appreciate that a trial court's failure to mention contested evidence when explaining its disposition does not necessarily establish that any error in admitting that evidence was harmless. *See, e.g., State v. Marrington*, 335 Or 555, 565, 73 P3d 911 (2003). Rather, the inquiry is contextually driven: Was the disputed evidence ultimately material to the resolution of issues disputed as trial? The trial court's comprehensive "speaking verdict" demonstrates the ultimate immateriality of the challenged evidence to the court's consideration and verdict.[6]

In that regard, this case is similar to *State v. Jones*, 255 Or App 761, 763-64, 298 P3d 652 (2013), in which we

---

[6] That understanding is corroborated by the trial judge's comments at sentencing. As noted above, 257 Or App at 699, not only did the court decline to apply an upward departure factor of "persistent involvement in similar offenses," but it explicitly indicated that, although there had been evidence of prior bad acts, it was "primarily" the victim's testimony that resulted in the verdict of guilty, and that the court gave its verdict "on the facts of [this] case," and that was what it focused on "almost entirely."

held that arguably erroneous admission of prior bad acts evidence had little likelihood of affecting the verdict, where the trial court in a bench trial stated that the disputed evidence "didn't have a big impact" on the verdict, and it was basing its decision on the victim's testimony. *See also State v. Fulmer*, 229 Or App 386, 211 P3d 942 (2009), *rev den*, 348 Or 13 (2010) (arguably inadmissible evidence in bench trial did not require reversal where evidence was partially cumulative and record did not indicate that court based its verdict on the disputed evidence); *State v. Hunter*, 141 Or App 73, 76-77, 918 P2d 104, *rev den*, 324 Or 78 (1996) (admission of arguably improper character evidence at bench trial had little likelihood of affecting the verdict where, in announcing its verdicts, the court relied primarily on other evidence). *Accord State v. Potts*, 242 Or App 352, 353, 255 P3d 614 (2011) (where trial court in bench trial specifically did mention its consideration of disputed evidence, court considered evidentiary error to be harmful). In those cases, as here, a review of the record at trial, especially including the trial court's specific findings on the dispositive issues, demonstrates that there was "little likelihood that the [purported error] affected" the court's verdict. *Davis*, 336 Or at 32.

Affirmed.